KNIGHT-MORLEY CORPORATION *v.* EMPLOYMENT SECURITY COMMISSION.

UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS— FINDINGS OF CIRCUIT COURT ON CERTIORARI—EQUALLY DIVIDED COURT.

Decision of circuit court on certiorari to the appeal board of the employment security commission that claimants for unemployment compensation, employees in polishing and buffing room, had left their work voluntarily and without good cause attributable to the employer and not because of claimed malfunctioning of ventilating blower and that the great weight of the evidence was against the findings of the appeal board for the claimants is affirmed by an equally divided court (CLS. 1952, § 421.29).

Appeal from Ingham; Coash (Louis E.), J. Submitted June 7, 1957. (Docket No. 36, Calendar No. 46,779.) Decided November 26, 1957.

Certiorari by Knight-Morley Corporation, a Michigan corporation, against the Michigan Employment

REFERENCES FOR POINTS IN HEADNOTES
3 Am Jur, Appeal and Error § 1160.

Security Commission and its appeal board, Norwood H. Beier and other claimants to review decision granting unemployment compensation. Judgment for plaintiff determining claimants disqualified for benefits. Defendant claimants appeal. Affirmed by an equally divided court.

*Langs, Molyneaux & Armstrong,* for plaintiff.

*Thomas M. Kavanagh,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *E. J. Setlock,* Assistant Attorney General, for defendant commission, asking reversal.

*Zwerdling, Zwerdling, Keith & Livingston* (*A. L. Zwerdling,* of counsel), for claimant defendants.

Sharpe, J. (*for affirmance*). Defendant Norwood H. Beier and others, together with the Michigan employment security commission, appeal from a judgment of the circuit court of Ingham county denying Norwood H. Beier and others benefits under the Michigan employment security act.

Certain facts are undisputed and are as follows: During the year 1953 plaintiff corporation operated a plant in Richmond, Michigan, and employed between 150 and 200 employees in the manufacture of die castings and brass objects. On August 31, 1953, the defendants, now claimants for unemployment benefits, were employed in a buffing room approximately 25 feet wide by 85 feet long. This room was equipped with 10 buffing jacks, 3 rotary automatic buffing machines and a straight line unit. The buffing room is responsible for polishing objects, and this is accomplished by placing the object against a revolving wheel. This wheel removes particles from the object and brings it to a high polish and luster. As a result of this process, abrasive particles, lint,

and dust are thrown from the wheel. The buffing room had an exhaust system. Each of the 2 wheels of the buffing jack was partially enclosed by a hood. From each hood a 4-inch diameter pipe led up to and connected with a 24-inch diameter pipe running into the buffing room. At the end of this 24-inch pipe there is a paddle-type fan which created suction to draw particles from the buffing wheels into and through the exhaust system.

On Friday, August 28, 1953, a fire occurred in the electrical system of the exhaust unit and the employees were required to go home because it was not operating properly. The following day the machine was repaired. However, by inadvertence, certain wires were crossed, causing the paddle wheel to revolve in the opposite direction.

On Monday, August 31, 1953, the day shift buffing employees started work at 7 a.m., but were sent home after working 2 hours in order to permit cleaning of the blowers. The afternoon shift reported to work in the buffing room at their normal starting time of 3:30 p.m. The day was hot and muggy. Shortly after work started a dispute arose as to the condition of the blower. The president of the corporation made an investigation and concluded that the machines were working properly and ordered the men to continue work. The men informed the corporation that they would not work unless the blowers were repaired. The men left the plant after working approximately 2 hours. Prior to leaving the plant, the men were informed that their leaving would be construed as quitting their jobs. The following day, September 1st, the blowers were repaired after the day shift left, and when the afternoon shift employees reported for work on September 1st they were informed that their cards had been pulled and they were considered as having quit their employment.

On October 19, 1953, a notice of determination was mailed holding that claimants were not discharged for misconduct with their work on August 31, 1953, and that they were not disqualified under section 29 of the act. An appeal was made to the referee who found in favor of claimants, holding that claimants did not leave their work voluntarily without good cause. The employer appealed to the appeal board. The appeal board adopted the findings of the referee.

The employer then appealed to the circuit court of Ingham county. The trial court entered an order denying claimants unemployment compensation. In an opinion the trial court stated:

"This court has reviewed the rather lengthy record and is of the opinion that the majority opinion of the appeal board is contrary to the great weight of the evidence. The record clearly indicates that the employees voluntarily left their work because of the fact that they only wanted to work for 2 hours, the same as was done by the morning shift. The testimony of Mr. Harsch, the union president, clearly shows that the employees did not intend to work more than the 2-hour period. It was somewhat over an hour after they started work when they started complaining that the blower system was not operating normally. The record shows that even though the fan was not turning in its usual direction it was still operating efficiently and there was enough suction to carry away the dust, lint, et cetera. The record shows that the day shift worked full 8 hours on September 1st, and that the blower system was operating efficiently during that period, and that no changes had been made in the system from the time the claimants walked out on August 31st.

"The record indicates that the claimants did not want to work longer than 2 hours, as was done by the morning shift, and used the blower system as their excuse for not working over the 2-hour period."

Claimants appeal and urge:

"That the lower court erred in fact and in law in reversing the decision of the appeal board of the Michigan employment security commission that the defendants and appellants were entitled to receive benefits without disqualification under the provisions of section 29(1)(b) of the Michigan employment security act, said judgment of the lower court being contrary to the great weight of the evidence and erroneous in law.

"That the lower court erred in failing to remand the proceedings to the appeal board for the purpose of taking further testimony from Dr. William Fredericks, a recognized expert in the industrial hygiene field, concerning the condition of the ventilation system claimed by appellants to have been the cause of the cessation of work by claimants."

Additional facts helpful to decision are as follows. Plaintiff's blower system had a rated capacity of 13,500 cubic feet of air per minute, which was 50% in excess of the 9,000-cubic-foot capacity required by law. (CL 1948, § 408.80 [Stat Ann § 17.39].) It is undisputed that a paddle-wheel type fan will pull or displace the air no matter which way it rotates. Lloyd Utter, the expert witness produced by appellant, testified:

"The paddle-wheel type of a fan will pull the air rotating either way. It would reduce something between 10 and 50% depending on how much it has to buck the contour of the system. * * * Reversing it would not affect it. * * * I will state, if it is a straight pipe, it doesn't make any difference which way the fan blows."

The statutory provisions involved in the case at bar are as follows:

"(1) An individual shall be disqualified for benefits: (a) For the duration of his unemployment in all cases where the individual has: (1) Left his work

voluntarily without good cause attributable to the employer or employing unit, or (2) has been discharged for misconduct connected with his work or for intoxication while at work." (Section 29 of Michigan employment security act, CLS 1952, § 421.29 [Stat Ann 1953 Cum Supp § 17.531].)

"The findings of fact made by the appeal board acting within its powers if supported by the great weight of the evidence, shall, in the absence of fraud, be conclusive, but the circuit court of the county, in which the claimant resides or in which the employer's principal place of business in Michigan is located, if no claimant is a party to the case, or the circuit court for the county of Ingham shall have power to review questions of fact and law on the record made before the referee and the appeal board involved in any such final decision, but said court may reverse such decision of said appeal board upon a question of fact only if it finds that said decision of the appeal board is contrary to the great weight of the evidence: Provided, That application is made within 15 days after mailing of a copy of such decision, by certiorari or by any other method permissible under the rules and practices of the circuit courts of this State." (Section 38 of Michigan employment security act [CLS 1956, § 421.38, Stat Ann 1955 Cum Supp § 17.540].)

The issue in the instant case is one of fact and may be stated as follows: Did the claimants have a bona fide reason for quitting work because of the condition of the blower system?

In coming to a decision in this case we have in mind that the burden of proving eligibility to benefits rests on the claimants. See *Cassar* v. *Employment Security Comm.*, 343 Mich 380. In support of their claims, claimants offered the following testimony.

Harry P. Harsch, president of Local 1125, testified in behalf of claimants as follows:

"Sometime after I began working that afternoon, after 3:30 p.m., the steward in the department called

something to my attention. The steward, Jose Munis, came to me at my machine and told me that the men in the department were refusing to work without the blower working. The blower was not working properly. The motor was running, but no draft. After this was called to my attention, I did not take this matter up with Mr. Hicks or Mr. Morley until every man in the department came up to me and asked me to see Mr. Morley. After they had done that, I went to the office and talked to Mr. Morley.

"I told Mr. Morley that the fellows were not going to work without the blower, and Mr. Morley told me that the blowers were working. He said he just had it repaired, and I asked him to come out in the plant. He did. He came out in the plant, and he walked up to my machine, I believe, and put his hand there, but he didn't say anything to me whether it was working, or whether it wasn't. From there Mr. Morley went down to the water tank, and Mr. Hicks was called at that time, and they claimed at that time that the water was too high in it, that they would have to drain it off.   *   *   *

"We made those tests to see how much these blowers were pulling. Ordinarily when the blower works properly, the air on your face, and your hands and arms are clear from lint, and abrasives that you use on machines; but on this day the abrasives and lint would pile on your arm a quarter of an inch thick, and it being a hot day, you would breathe it, and it would tickle on your face. That is the only test we tried. I was working on chrome, and my arms are not white, and they were snow white from the stainless steel I was using. I am a polisher and buffer, and I was polishing that day, and the material wouldn't pile on your arms if the blowers worked properly, because it sucks into the blower."

Lloyd Utter testified in behalf of claimants:

"I have heard the testimony regarding the operation of the blower system by Mr. Morley and Mr. Hicks, and others here as to operation, and in par-

ticular that part dealing with the reversing of a fan. As to what happens in that kind of a case, the ventilation engineer, on inspecting the ventilating system which is apparently being questioned, the first thing he would check to see whether or not the fan was operating in the right direction. Paddle-wheel fan, it is true, that it should move the same amount of air as if you had a straight run. However, in design of the ventilation system, if it doesn't follow the flow, it would lose resistance from 10 to better than 50%."

Norwood H. Beier testified in behalf of claimants:

"I got an unusual amount of dirt and lint on me that day from the wheel, more so than on other days. It just laid on me; nothing would draw it away from the machine. It was worse on that day than the previous days. I have been a buffer or polisher since April, 1951. On this afternoon of August 31st, I wanted the blower fixed at that time. I took this matter up with Mr. Harsch, and in taking it up with him, I was asking that it be fixed."

In behalf of the corporation the following evidence was presented:

Charles E. Morley, president of Knight-Morley Corporation, testified in substance that on Friday, August 28th, the corporation determined through selection of the seniority list which of the employees would be employed on Saturday to clean the blowing unit. It was the corporation's normal procedure to clean the blower system on Saturdays. Both the day and afternoon shifts refused to come in on Saturday to clean the blower system. On this same Friday afternoon a fire started in the switch box of the blower system and the switch burned out. Repair could not be effected immediately and the entire buffing room was sent home. The switch box was repaired the next day, Saturday.

On Monday, August 31st, the day shift reported for work. It was the corporation's opinion that the

blower system was working correctly and in the manner it had always worked. Under the contract between the company and the union, if people were brought into the plant it was necessary that they be given 2 hours of work or 2 hours of pay in lieu thereof. The entire department worked for approximately 2 hours, at which time the corporation sent the majority of the department home, retaining those with the highest seniority to clean the blower that had not been cleaned on Saturday. No complaints were made during this 2-hour period regarding the operation of the machines or the blower.

About a half hour before the afternoon shift came in on August 31, 1953, Harry Harsch, president of Local 1125, UAW-CIO, and an employee on the afternoon shift in the buffing department, learned that the morning shift had been sent home after 2 hours' work, and believing this was because of the heat he requested Morley to also send the afternoon shift home at the end of 2 hours. Morley advised Harsch that the morning shift had not been sent home because of the heat, but were sent home because the blower system needed cleaning. Morley would not give the men permission to leave because their production was needed.

The afternoon shift on August 31st came in at its regular time at 3:30 and started to work in the polishing and buffing department. They worked approximately 2 hours when Harry Harsch reported to Morley that the blower system was not working properly and asked Morley to investigate the situation. Morley went into the plant and determined that the blower system was working in the same manner it had always worked. He tested the machines by blowing cigar smoke into the machines to see whether or not the smoke would be taken up, and it was taken up. He testified that this indicated that

there was suction and that the system was running in the same manner it had always run.

After the men had walked out, Morley took various particles normally run in the plant, including a mirror shell made out of brass that was fairly heavy, and placed them near the blower and they were taken up into the blower. After the walkout the employees cards were pulled and their employment terminated for walking out in violation of the no-strike, no-walkout provision of the labor contract entered into by the union and the corporation.

Morley further testified that the blower system was installed sometime in 1946 with a rated capacity of 13,500 cubic feet of air a minute, which is 50% more than is required by law (CL 1948, § 408.80 [Stat Ann § 17.39] ) ; that the rated capacity on August 31st was not determined; that prior to August 31st the blower had been inspected by the department of labor and industry; that there was no disturbance of any kind in respect to the same blowers and machines the week before the walkout; that reversing of wires on the fan took place at the end of the day shift on September 1, 1953, and there was very little noticeable difference in the functioning of the fan; that the day shift on September 1st worked all day without apparent discomfort.

Wilford Hicks, afternoon superintendent for Knight-Morley Corporation, testified in substance that the first time that he heard about the walkout was a few minutes before 5 o'clock on August 31st when the men complained that the blower wasn't working right. Hicks tested the machine with the cigarette he was smoking and the smoke went up the flue. He testified that he also tested the machine with some dirt and the machine dragged it out of his hand. He indicated to the men that the machines, in his opinion, were working properly. After the walkout Hicks made a second test, testing more than

1 machine, including the far one which had the least suction. He testified that the suction was drawing the lint and dust efficiently, and in his opinion working properly so that the machines should not have been an annoyance or a hazard to the workmen.

Herbert Hebel, general plant superintendent for Knight-Morley Corporation, testified in substance: That on Saturday, August 29th, he was unable to get any employees to clean the blower system and the work was done Monday morning, August 31st. On August 31st the day shift worked until 9 o'clock, when he dismissed the majority of the employees, keeping about 3 employees to clean up the blower in the buffing room. He was not present when the afternoon shift walked out, and there was no grievance presented to him prior to the time they left. After the afternoon shift walked out he had the maintenance foreman check the equipment. The maintenance foreman held a mirror shell under the blower "and it sucked it out of his hand into the blower, and into the water."

In our opinion the evidence shows that claimants produced 2 witnesses, Harsch and Beier, who testified that their hands and arms were covered by an unusual amount of dirt and lint just prior to their walking out on the job. As opposed to this evidence, there is the testimony of Morley and Utter that reversing the fan will pull the air rotating either way. Morley testified that the blower system had an excess capacity of 50%, and that on the day in question there was no more dust and lint than usual. There is evidence that before the 3:30 shift started there was a demand made on Morley that the men be sent home after 2 hours of work to equalize their work time with that of the morning shift because it was an excessively hot day.

Under section 38 of the Michigan employment security act (CLS 1956, § 421.38 [Stat Ann 1955 Cum

Supp § 17.540] ) the trial court has the power to review questions of fact and law, but may reverse the appeal board on questions of fact if it finds that the decision of the appeal board is contrary to the great weight of the evidence. There was evidence presented to the trial court that the claimants voluntarily left their work because they only wanted to work for 2 hours, the same as the morning shift. We are of the opinion that the great weight of the evidence is against the findings of the appeal board and that the trial court was correct in so holding.

Plaintiff urges that the dispute was a matter that was subject to the grievance provisions of the contract and that the contract was violated when claimants walked out in direct violation of the no-strike, no-work-stoppage clause. It appears that the labor agreement between plaintiff corporation and Local No. 1125, International Union, United Automobile Aircraft, and Agricultural Implement Workers of America, UAW-CIO, contains the following:

"8. (a) Step 1. A grievance of an employee, or group of employees, shall be taken up by the employee, or group of employees, with the group steward and then, together, with the departmental foreman. If a satisfactory settlement cannot be arrived at with the foreman, the grievance shall be then referred by the steward to:

"1. The chief steward, if the grievance originates on a shift where there is no committeeman.

"2. A committeeman, if the grievance originates on a shift where a committeeman is working.

"(b) Step 2. The chief steward or a committeeman (whichever the case may be), accompanied by the steward, shall attempt to work out a solution with the foreman. If no satisfactory settlement results the chief steward (or committeeman) may then reduce the grievance to writing.

"(c) Step 3. The grievance written or oral shall then be referred by the union to the group commit-

teeman, who shall then take the grievance up with the plant superintendent for discussion and possible settlement, and the position of the superintendent shall, within 24 hours, be written on the grievance form if presented in writing.

"(d) Step 4. If, as a result of step 3, the grievance remains unsettled the plant shop committee shall then further process the grievance in writing in a meeting with plant management, as hereafter provided for, who will give its answer in writing within 5 days thereafter.

"(e) Step 5. If the grievance remains unsettled, the union and the company may present it to an arbitrator mutually agreed upon by the company and the union, if no arbitrator is agreed upon, then an arbitration panel consisting of 3 members; 1 member to be chosen by the company and 1 member to be chosen by the union. These 2 members shall choose the third member. The decision of the arbitration panel shall be final and binding on both parties and the cost of the third member shall be borne equally by the company and the union. The arbitration panel may not add to or subtract from the term of this agreement."

Since the above case was decided in the circuit court, we have handed down our decision in *Cortez* v. *Ford Motor Company,* 349 Mich 108. That case involved a dispute of approximately 108 women who claimed that they were laid off from work at Ford Motor Company's Dearborn stamping plant; that male employees of lesser seniority were retained in employment in that unit during the period of their layoffs; that they filed grievances with the union concerning their layoffs, but the union refused to process such grievances in violation of the seniority and grievance provisions of the UAW-CIO Ford Motor Company contract. A part of the answer filed to plaintiffs' declaration was that plaintiffs failed to make use of the grievance procedure set up by the

contract. Plaintiffs' declaration was dismissed on motion and upon appeal we affirmed the action taken by the trial judge. In that case we stated (pp 112, 113, 126, 127):

"Since the development of collective bargaining agreements as a method of bringing order out of the chaos of industrial disputes, a good deal of case law dealing with seniority has developed. These cases universally hold that seniority rights, being generally the creation of the union-management contracts wherein they are described, may be enforced only in accordance with the terms of such contracts. *Ryan* v. *New York Central R. Co.*, 267 Mich 202; *Hartley* v. *Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees*, 283 Mich 201; *Zdero* v. *Briggs Manfg. Co.*, 338 Mich 549; *Emmons* v. *Grand International Brotherhood of Locomotive Engineers*, 340 Mich 368; *Elder* v. *New York Central R. Co.* (CCA), 152 F2d 361.

"The cases likewise illustrate a notable reluctance on the part of the courts to assume the role of umpire in industrial disputes, particularly when adequate machinery exists within the industry for such purpose. *Emmons* v. *Grand International Brotherhood of Locomotive Engineers, supra; Slocum* v. *Delaware, Lackawanna & Western R. Co.*, 339 US 239 (70 S Ct 577, 94 L ed 795). * * *

"Plaintiffs had access, under the contract, to the steps in the grievance procedure through presentation of their grievance to the company foreman. There is no allegation that this was done. The circuit judge was correct in dismissing the declaration in its assumpsit count, in the following words:

" 'Our Supreme Court, in the case of *Leadon* v. *Detroit Lumber Company*, 340 Mich 74, has stated that such failure is fatal to a claim in assumpsit. In denying Leadon's claim, the Supreme Court said (p 78):

" ' "If plaintiff is relying upon rights arising out of the contract between the local union, of which he was a member, and the employer, it is enough to say

that he never pursued the remedies afforded him under that contract. See *Hartley* v. *Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees,* 283 Mich 201; *Mayo* v. *Great Lakes Greyhound Lines,* 333 Mich 205; *Zdero* v. *Briggs Manufacturing Co.,* 338 Mich 549." '

" 'Hence, this court must hold that such failure on the part of the plaintiffs herein is fatal to their claim in assumpsit in this court.' "

We have outlined that part of the contract relating to the manner of instituting and settlement of grievances. It is an admitted fact that such steps were not taken.

In *Cassar* v. *Employment Security Comm.,* 343 Mich 380, we held that employees working under a labor contract containing a grievance procedure and no-strike clause are guilty of misconduct in connection with their work in walking out in breach of their contract, and are disqualified for unemployment compensation benefits under section 29 of the act.

The judgment is affirmed, with costs to plaintiff.

DETHMERS, C. J., and KELLY, and CARR, JJ., concurred with SHARPE, J.

SMITH, J. (*for reversal.*) We have a simple fact question. The principal issue before us is whether we should approve the findings of the triers of the facts with respect to this fact question.

We have the power, it is true, but not the right, to make complete nonsense out of the administrative process. In a simpler day all fact-finding and adjudicating powers were in the courts. It is true no longer. The complexities of our society, its mechanization, its great concentrations of power and of people, together with certain inadequacies of the judicial process, have resulted in what is known as the administrative process. However well-equipped

the courts may be to settle private controversies upon matters brought to them, they are ill-equipped to carry out a legislative policy on a day-to-day basis, even if constitutionally able. A part of that process involves, at times, the making of factual determinations.

Our problem involves such administrative process. It relates to unemployment compensation. The law is a new one, designed to cope with a social evil, administered by a commission vested with broad powers. "The State," as Mr. Justice Holmes said in speaking of a tax board (*Chicago, B. & Q. R. Co.* v. *Babcock,* 204 US 585, 598 [27 S Ct 326, 51 L ed 636] ), "has confided those rights to its (*i.e.,* the board's) protection and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law." We of the courts are given the right to review the employment security commission's decisions, but the right is carefully circumscribed. The statute tells us in so many words that the courts shall not reverse the decision of the appeal board of this commission on a question of fact unless the finding is contrary to the "great weight of the evidence." It behooves us, who are so zealous in keeping others within constitutional limits, to exercise the utmost in judicial self-restraint, lest our unreviewable actions tarnish the splendor of our oft-repeated avowals of constitutional deference. We say these things because they are of the essence of this case.

Mr. Justice SHARPE apparently agrees with us that this case involves simply an issue of fact. He puts it in this way: "The issue in the instant case is one of fact and may be stated as follows: Did the claimants have a bona fide reason for quitting work because of the condition of the blower system?" He would, however, affirm the circuit court's reversal of the appeal board on this fact issue, the determination

of which involves a weighing of the credibility of the testimony of various witnesses. It is our opinion that what the circuit court actually did was to substitute its judgment for that of the appeal board. This it cannot do.

The problem presented, the adjustment of the role of the judiciary and the administrative tribunal in the administration of law, is one of far-reaching importance. As we observed at the outset, the administrative tribunal is a product of today's complex society. Government today must apportion and control competing rights beyond the ken of Lord Coke: broadcasting and air transportation, the production and use of electricity, gas, and atomic energy, the creation and the operation of vast industrial complexes, and, with all of the above, the tremendous social and human problems attendant thereon. It is an attempted solution of one of the latter with which we are here concerned.

The reasons for the withdrawals from the courts of these problems we need not vex. Thoughtful students foretold, years ago, the coming administrative expansion. Mr. Elihu Root, President of the American Bar Association (41 Am Bar Asso Rep, pp 355, 368, 369) thus addressed its membership nearly a half-century ago:

"There is one special field of law development which has manifestly become inevitable. We are entering upon the creation of a body of administrative law quite different in its machinery, its remedies, and its necessary safeguards from the old methods of regulation by specific statutes enforced by the courts. As any community passes from simple to complex conditions the only way in which government can deal with the increased burdens thrown upon it is by the delegation of power to be exercised in detail by subordinate agents, subject to the control of general directions prescribed by superior

authority. The necessities of our situation have already led to an extensive employment of that method. * * * There will be no withdrawal from these experiments. We shall go on; we shall expand them, whether we approve theoretically or not, because such agencies furnish protection to rights and obstacles to wrongdoing which under our new social and industrial conditions cannot be practically accomplished by the old and simple procedure of legislatures and courts as in the last generation."

The difficulties foreseen were realized in abundant measure. Many lawyers and judges, trained in the common law, were hesitant, or reluctant, to carry out the legislative mandate respecting the administrative process, unable to move forward as our people desired. It was a former chief justice of the United States, Harlan Stone, who in an address delivered as a part of the Harvard tercentenary celebration (50 Har L Rev, 4, 16–18), well described, out of an abundance of experience, the reception accorded the administrative process in many courts and by many members of the bench and bar:

"Perhaps the most striking change in the common law of this country, certainly in recent times, has been the rise of a system of administrative law, dispensed in the first instance through authority delegated to boards and commissions composed of nonjudicial officers. The reception by the profession and the courts of these new administrative agencies has exhibited an interesting parallel to their attitude toward other forms of external change. These agencies soon became a matter of concern, not alone because of their novelty and statutory origin, but because they were brought into the law as a means of law enforcement and as the instruments for providing, to a limited extent, remedies for its violation, of which the courts had possessed a virtual monopoly.

"Under the civil law the rise of a system of administrative law, independently of the courts, came as a welcome formulation of principles for the guidance of official action, where no control had existed before. To the common law the use of these administrative agencies came as an encroachment upon the established doctrine of the supremacy of the courts over official action. It was the substitution of new methods of control, often crude and imperfect in their beginnings, for the controls traditionally exercised by courts—a substitution made necessary, not by want of an applicable law, but because the ever-expanding activities of government in dealing with the complexities of modern life had made indispensable the adoption of procedures more expeditious and better guided by specialized experience than any which the courts had provided.   *   *   *

"Addresses before bar associations 20 years ago, discussing the rise of new administrative agencies, are reminiscent of the distrust of equity displayed by the common-law judges led by Coke, and of their resistance to its expansion. We still get the reverberations of these early fulminations in renewed alarms at our growing administrative bureaucracy and the new despotism of boards and commissions. So far as these nostalgic yearnings for an era that has passed would encourage us to stay the tide of a needed reform, they are destined to share the fate of the obstacles which Coke and his colleagues sought to place in the way of the extension of the beneficent sway of equity. These warnings should be turned to account, not in futile resistance to the inevitable, or in efforts to restrict to needlessly narrow limits activities which administrative officers can perform better than the courts, but as inspiration to the performance of the creative service which the bar and courts are privileged to render in bringing into our law the undoubted advantages of the new agencies as efficient working implements of government, surrounded, at the same time, with every needful guarantee against abuse.

"Fortunately, the theories, firmly established in this country, of due process and of the supremacy of law over official action, afford that protection of individual right and justice which is the ideal of the common law. The time has come for a more ready recognition that the procedures worked out by administrative bodies have realized this ideal largely without the coercive intervention of courts, and that they have set up standards for the appraisal of the specialized experience with which they are concerned which courts could have formulated, if at all, only more tardily and with far greater difficulty."

Ancient dogma of the common law, valid enough in their origins and as originally applied, have been wrenched out of context and employed to defeat the purpose of the new legislation and its administration by the agencies created for that purpose. Thus, our Court has more than once stated that the workmen's compensation acts, being "in derogation of the common law, must be strictly construed" (*Smith* v. *Wilson Foundry & Machine Co.*, 296 Mich 484, 487). Chief Justice Stone continues (p 18):

"We need to be reminded, too, that in the construction of statutes establishing administrative agencies and defining their powers there is little scope for the ancient shibboleth that a statute in derogation of the common law must be strictly construed, or for placing an emphasis on their particulars which will defeat their obvious purpose. Legislatures create administrative agencies with the desire and expectation that they will perform efficiently the tasks committed to them. That, at least, is one of the contemplated social advantages to be weighed in resolving doubtful construction. It is an aim so obvious as to make unavoidable the conclusion that the function which courts are called upon to perform, in carrying into operation such administrative schemes, is constructive, not destructive, to make administrative agencies, wherever reasonably possible, effective in-

struments for law enforcement, and not to destroy
them."

It is against this background of pressing need,
legislative solution, and hesitant judicial reception
that we turn to the precise issue confronting us. As
we pointed out, we are here concerned with a rela-
tively simple factual determination. In respect of
such the legislative mandates are clear enough, not
only in our own statutes, but in the nationwide ad-
ministrative pattern generally: It is the business
of the agency to ascertain the facts. (The statutes
vary somewhat in language. To what degree, if at
all, the statutory variations in phraseology actually
vary the area in which the agency's determinations
are conclusive is a matter on which the courts are
not agreed. See Dean Stason's article, "Substantial
Evidence in Administrative Law," 89 U of Pa L Rev
1026.) In the statute before us the applicable pro-
vision is that "The findings of fact made by the ap-
peal board acting within its powers, if supported by
the great weight of the evidence, shall, in the absence
of fraud, be conclusive" and "said court [circuit
court for the county of Ingham] may reverse such
decision of said appeal board upon a question of
fact only if it finds said decision of the appeal board
is contrary to the great weight of the evidence."
Michigan employment security act, PA 1936 (Ex
Sess), No 1, § 38, as amended (CLS 1956, § 421.38
[Stat Ann 1955 Cum Supp § 17.540] ).

We start from the premise that it is our duty to
accept this statute as expressing the will of our
people and to give it complete effect. It is not our
function, nor that of one of our subordinate courts,
to substitute our judgment on the facts for that of
the fact-finding tribunal, or to usurp the function
that the legislature has vested in the agency. We
have not been free from such usurpation in the past

·(*Hazel Park Racing Association, Inc.*, v. *Racing Commissioner*, 343 Mich 1) and it should not continue. Mr. Justice Cardozo addressed himself to this practice in words we would do well to ponder (*Federal Trade Commission* v. *Algoma Lumber Company*, 291 US 67, 73 [54 S Ct 315, 78 L ed 655] ).

" 'The findings of the commission as to facts, if supported by testimony, shall be conclusive.' 15 USC, § 45. The court of appeals, though professing adherence to this mandate, honored it, we think, with lip service only. In form the court determined that the finding of unfair competition had no support whatever. In fact what the court did was to make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences. Statute and decision (*Federal Trade Comm.* v. *Pacific States Paper Trade Assn.*, 273 US 52, 61, 63 [47 S Ct 255, 71 L ed 534] ) forbid that exercise of power."

It is clear, then, that when the legislature provided that the circuit court might reverse the decision of the appeal board only if it found such decision to be "contrary to the great weight of the evidence," what it told us (and the board) was that the board's finding should be almost conclusive. How conclusive? It is clear, at the one extreme, that we need not accept blindly the factual conclusions of an agency (any more than we do those of a jury). It is equally clear, at the other extreme, that we do not grant a trial *de novo* in this or the circuit court, a process which would combine the dual faults of imposing a maximum load on the courts with a minimum degree of responsibility in the commission. The legislature has drawn the line between these 2 extremes for us in the words "great weight" but such words (Stason, *supra*) have no more intrinsic content than other famous legal doublets such as the "reasonable man," "due process," or "contributory

negligence." They require interpretation, which, in turn, will sometimes require a consideration of what we in the courts term "expert" testimony (*e.g.,* how broad is the channel necessary for television?), or an ascertainment of factual matters relating to jurisdiction or standards, as well as the technically less complex determinations of the credibility of the witnesses appearing before the commission. The case before us, it will be observed, requires merely that there be resolved one of the simplest possible issues of fact. (Did the employees leave their work because of the asserted faulty condition of the blowers?) It comprehends no more than the credibility of certain witnesses. Thus we may leave to future cases, as they arise, the enunciation of criteria for distinguishing the so-called question of law from questions of fact in the more complex situations (Davis, Administrative Law, ch 20), to the degree that such is possible, and the factors involved in their resolution.

What, then, is our scope of review, as to this agency, under the "great weight of the evidence" criterion? We may be aided by a consideration of our appellate duties with respect to our review of actions at law. The analogy is not precise (*e.g.,* in administrative law we deal not with the findings of untrained jurors but with those of trained personnel operating in highly specialized areas) but it will be helpful. In the area of appellate review of lower-court actions and suits, our restrictions are fairly well established. Thus, although in a nonjury law action we look for a preponderance of the evidence (see discussion of BLACK, J., in *Schneider* v. *Pomerville,* 348 Mich 49) in a jury case, upon review, "The fact that we would reach a different conclusion than did the jury is not controlling. We should set aside a verdict, and only set one aside, when it is against the overwhelming weight of the evidence." *McConnell* v. *Elliot,* 242 Mich 145, 147. If such words as

overwhelming weight, great weight, and clear weight have approximately the same content we would be justified in saying that we should not reverse the finding of the administrative tribunal on an issue of fact unless we would set aside a jury verdict under similar circumstances. It is a matter of interest that Dean Stason, in his article "Substantial Evidence in Administrative Law," *supra,* 1038, proposes the following with respect to the term "substantial evidence":

"The term 'substantial evidence' should be construed to confer finality upon an administrative decision on the facts when, upon an examination of the entire record, the evidence, including the inferences therefrom, is found to be such that a reasonable man, acting reasonably, *might* have reached the decision; but, on the other hand, if a reasonable man, acting reasonably, *could not* have reached the decision from the evidence and its inferences then the decision is not supported by substantial evidence and it should be set aside. In effect, this is the prevailing rule in jury trials relative to the direction of verdicts, and is also the prevailing rule applied by *appellate courts* in setting aside jury verdicts because contrary to the evidence."

(See, also, Stone, J., in *National Labor Relations Board* v. *Columbian Enameling & Stamping Co.,* 306 US 292, 300 [59 S Ct 501, 83 L ed 660]:

"Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' *Consolidated Edison Co.* v. *National Labor Relations Board,* 305 US 197, 229 (59 S Ct 206, 83 L ed 126), and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. See *Baltimore & Ohio R. Co.* v. *Groeger,* 266 US 521,

524 [45 S Ct 169, 69 L ed 419]; *Gunning* v. *Cooley,*
281 US 90, 94 [50 S Ct 231, 74 L ed 720]; *Appalachi-*
*an Electric Power Co.* v. *National Labor Relations*
*Board* [CCA], 93 F2d 985, 989.")

We conclude that under the statute here before us
·our scope of review is no broader than that exer-
cised by us in setting aside a jury's verdict, our lati-
tude no greater.   It may, indeed, due to the differing
considerations of skill, policy, and function of the
fact-finding tribunals in the governmental process,
be far narrower.   The precise scope, however, we
need not on these facts further explore, for it is
·clear that even under the test applied to review of
a jury's function we would not tamper with the
factual determination made.

It is not necessary that we cite and recite the con-
tradictory evidence adduced before the referee and
before the appeal board.   We do not propose to
weigh the credibility of witness Harsch against wit-
ness Morley or of witness Hicks against witness
Beier.   We do not propose to comment upon either
the sufficiency or the actual results of the "cigar
·smoke" test employed by the president of the cor-
poration to ascertain whether or not the blowers
were working properly when he received the com-
·plaint of the men.   He says the smoke went up.   An
employee says it did not.   If it did, does that estab-
lish that the same suction would have removed par-
ticles of abrasives?   Again an argument.   We do not
propose to dwell in detail upon the fact that, after
the men had left their work, allegedly because of the
inefficiency of the blowers, the wires to the fan were
found reversed so that it was running backwards.
Does this make any difference in a paddle-wheel
fan?   Another argument.

The resolution of such fact controversies is not our
function nor is it that of the Ingham court.   The
.answer to them lies in the value of human observa-

tions, of dialogue face to face, of the averted gaze or the hesitant answer as contrasted with the forthright and confident reply. Certain we are only of this: Even were we gifted with the insight to read behind the printed page, to divine in these chambers the currents and cross-currents of feeling and emotion obvious to all in the courtroom, thus to scour away the dross and see exposed the stark issue of truth or falsity from a witness' words—even, as we say, were we so gifted, we would not be here permitted to exercise those great gifts. The determination of the credibility of a witness, under the statute, lies with the trier of the facts. We are not he.

If anything at all is clear upon this ample record with its sharply contested issues of fact it is this: A jury's findings that the employees left their work because the blower system had broken down and was not removing the abrasives, dust, and lint from the air could not be set aside by us as against the great weight of the evidence. It is equally obvious that the decision of the appeal board is entitled, under the clear wording of the statute, to at least as much deference. That settles the matter, so far as the courts are concerned, if we are going to conform to the statute.

The plaintiff corporation asserts an alternative ground for disqualification of the claimants, that they "were discharged on August 31, 1953, for misconduct connected with their work and were therefore disqualified within the meaning of section 29(1) (a)(2) of the act." This theory is apparently accepted by Mr. Justice Sharpe upon the authority of *Cassar* v. *Employment Security Commission,* 343 Mich 380. The *Cassar Case,* however, is not here controlling. The issue there presented was whether we would apply to a labor dispute the section of the employment security act specifically dealing with labor disputes (section 29[1] [b] of CL 1948 and

CLS 1952, § 421.1 *et seq.* [Stat Ann 1950 Rev and Stat Ann 1953 Cum Supp § 17.501 *et seq.*]) or the section (section 29[1] [a] [2]) dealing with a workman's misconduct or intoxication. The majority of the Court chose to apply the latter section. This, the dissenting opinion urged, was error, unjustified under any rational theory of statutory construction, since it refused to apply to a labor dispute the very section of the statute specifically dealing with labor disputes. And in favor of what section? In favor of a section of the act dealing with misconduct and intoxication, in order to apply which section we first had to enter upon a moral judgment as to the rightness or the wrongness of the strike, a judgment we had theretofore resolutely declined to exercise with respect to the payment of unemployment compensation.

"This Court need not characterize the 'fault' in the strike. Unemployment compensation does not depend upon the merits of a labor dispute." *Intertown Corporation* v. *Unemployment Compensation Commission,* 328 Mich 363, 366.

For further observation on the *Cassar Case* see dissent therein, 343 Mich at page 383.

The *Cassar Case,* however, does not control decision in the case before us because of significant factual differences. Here the working conditions in the plant at the time the men left were such that the air was "foggy" and the men covered "with lint and abrasives and dirt." If we are to accept the holding of the finders of fact (concerning which we need at this point say no more) we must conclude that this situation was due to the faulty conditions of the blowers. The cessation of work under such circumstances could not reasonably be characterized, in the words of the majority opinion in the *Cassar Case,* as evincing (p 405) "a disregard of standards of

behavior which the employer has a right to expect of his employee." Rather, the contrary. Under such conditions there was no time for filing written grievances. The claimants were confronted with an abnormal condition of immediate concern to anyone having a reasonable regard for his own health. The referee (without the aid of the *Cassar* opinion) refused to find misconduct under such circumstances, the appeal board affirmed the referee, and we are in full accord therewith. In applying the law to the acts of men under what seem to them hazardous conditions we would do well to ask ourselves, with Cicero, whether justice is founded upon nature, or upon theory.*

Reversed and remanded for reinstatement of the order of the appeal board. Costs to appellants.

EDWARDS, VOELKER, and BLACK, JJ., concurred with SMITH, J.

---

* *Nesque opinional sed natura constitutum esse jus.* Cicero, De Legibus, Bk i, ch 10, § 28.