PEADEN v. EMPLOYMENT SECURITY COMMISSION.

1. Unemployment Compensation — Labor Dispute — Liquidation Order.

Finding of appeal board of employment security commission that claimants were disqualified from obtaining unemployment compensation benefits for period after employer's liquidation order by reason of work stoppage due to a labor dispute, affirmed by the circuit court on certiorari to it, is affirmed on appeal to Supreme Court, where it appears that after 3 months of negotiations followed by strike that was prolonged for a subsequent period of over 3 months without settlement, the employer ordered liquidated the copper mine, smelters and other properties involved in the existing strike, that a week later the strike was settled and nearly 3 weeks more elapsed before normal operations were resumed, it appearing, also, that certain maintenance and salaried employees were certified for unemployment compensation benefits for period following liquidation order (CLS 1956, § 421.29, subd [1] [b]).

---

References for Points in Headnotes

[1] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 36.
Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes. 28 ALR2d 287.

2. COSTS—UNEMPLOYMENT COMPENSATION—LIQUIDATION ORDER.

No costs are allowed in proceeding to recover unemployment compensation benefits involving application of statute relative to disqualification of claimants for benefits following employer's order to liquidate the copper mining and smelting properties involved (CLS 1956, § 421.29, subd [1][b]).

SMITH, VOELKER and KAVANAGH, JJ., dissenting.

DETHMERS, C. J., and CARR and KELLY, JJ., dissenting as to costs.

Appeal from Ingham; Coash (Louis E.), J. Submitted January 8, 1959. (Docket No. 32, Calendar No. 47,676.) Decided April 13, 1959.

Paul R. Peaden and other employees of Calumet Division, Calumet & Hecla, Inc., filed claims for unemployment compensation benefits following announcement of liquidation of local division during strike. On certiorari, circuit court upheld the Employment Security Appeal Board determination of disqualification because of participation in labor dispute. Plaintiffs appeal. Affirmed.

*DeFant & Lynch (Michael F. DeFant, of counsel),* for plaintiffs.

*Norman McLean,* for defendant.

BLACK, J. Plaintiff-claimants were and are employees of defendant Calumet Division—Calumet & Hecla, Inc. They applied for unemployment benefits under the Michigan employment security act, alleging (as the issue comes here) eligibility for such benefits starting as of August 12, 1955, and continuing through September 10, 1955. The commission and hearing referee upheld claimants and directed payment accordingly. The appeal board, sitting in review, reversed these rulings and, by way of conclusion of its lengthy findings, ruled as follows:

"It is held that the claiments were unemployed because of a work stoppage caused by a labor dispute in the establishment of Calumet Division, Calumet & Hecla, Inc., during the period beginning May 2, 1955, and ending at week ending September 10, 1955, and that the claimants are disqualified from obtaining such benefits for the above-stated period under section 29, subd (1) (b) of the act." (CLS 1956, § 421.29 [Stat Ann 1957 Cum Supp § 17.531].)

Claimants thereupon sued out certiorari in the Ingham circuit to review the appeal board's determination. The circuit court found no error and entered an order of affirmance. From such order claimants have appealed to this Court.

The labor dispute viewed in the appeal board's findings threatened and then critically affected the economic welfare of what is known—in Michigan— as "the Copper Country." Comprising the counties of Houghton and Keweenaw and nearby territory, this is Michigan's remote and geologically historic Keweenaw peninsula. For upwards of a century the mining of copper and copper-bearing ores has furnished the leading source of employment and business in the area, and defendant Calumet has been the principal employer of copper miners and copper smelters therein. In most of the villages Calumet has provided and now provides necessary public utility services; also police and fire protection. It is in position to cut these services off at will. Here, indeed, will be found the substance of Ernie Ford's "company town." Comprehensive, then, is the picture of general economic woe in the copper country when Calumet is "down." Understandable also is the fact that the labor dispute we are to consider—for the sole purpose of determining whether there is a "rational basis"* for the conclusions reached by the

---

* *Rochester Telephone Corp.* v. *United States,* 307 US 125, 146 (59 S Ct 754, 83 L ed 1147).

appeal board—was ultimately settled by jackscrew force of punitive and quite irresistible sanctions.

Calumet operates "copper mines, smelters, a refinery, a railroad and other manufacturing installations in Houghton and Keweenaw counties." Some 1,700 hourly-rated employees in its production and maintenance departments were and are represented by the United Steel Workers of America-CIO, hereinafter referred to as the union. A working contract, agreed upon by the union and Calumet in 1954, was due to expire April 30, 1955. The union desired to "terminate, reopen, or amend" the contract and served notice to such effect on Calumet. Negotiations were opened in February of the year and continued without fruitful result until May 1st, on which date the union—these claimants participating—voted to strike Calumet. The strike was called for and commenced May 2d, and continued with developing bitterness* until August 10th, on which date the union voted "to reject the final offer" of Calumet. At this juncture the corporate hammerlock was applied to the Copper Country. August 12th (a Friday) Calumet caused to be published, in the Daily Mining Gazette of Houghton (the daily newspaper of the Copper Country), that which counsel refer to as "the liquidation order." The salutation and pursuing declarations of such order portray graphically the overpowering play of the final hand. They read:

*"To The People of the Copper Country:*
"This letter is directed to the people of the Copper Country for the purpose of informing them of the situation confronting the management of Calumet

---

* The strike resulted in commencement of flooding of the mines (steadily-required pumping thereof having been abruptly stopped) and in the inevitable cooling—in the smelter furnaces—of nearly a million pounds of molten copper. However, and with the aid of statutory mediators, attendant danger and impending permanent damage shortly were averted by resumption of pumping and clearing of the furnaces.

& Hecla and to let them know immediately what action the management has found it necessary to take.
\* \* \*

"In the current dispute with the union, we have sought all reasonable means to effect a settlement. We have endured a long, costly and illegal strike. We have maintained pumping of the mines, we have kept the smelter furnaces hot, and have continued to operate the utilities vital to the communities in which we have operated. We have done these things in the hope that an agreement could be reached.

"As soon as it became possible, we made an offer which was as liberal as possible. There is a limit beyond which it is impossible to go. We have reached that limit. However, a substantial majority of the members of the union saw fit to reject our offer.

"In view of this clear-cut decision by the union, I have no alternative but to exercise the authority voted by the board of directors on May 26, 1955, to liquidate the Calumet Division. Accordingly, the following action is being taken:

"1. All presently employed hourly-rated and salaried employees not essential to the orderly liquidation of the division are being laid off. Those salaried employees who can be employed in other activities of the company will be transferred.

"2. All mine pumping is being terminated.

"3. Copper at the smelter will be refined and shipped and the furnaces shut down.

"4. The inventory of supplies will be sold.

"5. Machinery and equipment will be disposed of.

"6. The proper authorities in the communities will be notified that they must now take over the responsibility for utilities and services, such as pumping water, and police and fire protection.

"Recognizing its obligation to its employees and the community, the management, since 1930, has struggled against terrific odds to continue operations in the Copper Country. Investments in modern plant and equipment and in people have been made with the hope of reducing costs and maintaining a

profitable enterprise in this district. While progress has been made, rising costs have kept pace with operational improvements and the division has remained marginal. However, we recognize that in addition to our obligation to the employees and the community, we have a very important responsibility to our shareholders (the owners of the company). If we are unable to avoid loss, to say nothing of earning a reasonable return on the investment, it is the duty of the management to act in the best interests of the company.

"Calumet & Hecla has had an enviable and honorable record in the Copper Country for over 90 years. It is with heavy hearts that circumstances beyond our control have forced us to this tragic decision which we recognize will seriously affect the lives and fortunes of many innocent and loyal people.

"By authority of the board of directors,
                        E. R. Lovell, President"

Immediately after publication of the above order Calumet commenced making good the quoted declarations of intent. It definitely intended to go out of business and moved physically to implement that purpose. In the meantime, however, the impact of the order—on the Copper Country—took full effect. Publication being on Friday, the following Monday (August 15th) saw eager public renewal of negotiations toward settlement of the pending labor dispute and, ere lapse of a week, the strike was hurriedly settled. August 21st a new working contract was agreed upon and signed by the contenders (yes, on Sunday).

Remaining events, consisting principally of cooperative efforts of all to get the mines and smelters in condition for normal employment and production,* are of little moment except in this: Unlike

---

* As previously noted, the appeal board determined that the disqualifying work stoppage ended September 10, 1955. By that date Calumet's principal mining and manufacturing operations had been resumed with recall of most of the workers.

*Great A. & P. Tea Co.* v. *New Jersey Department of Labor & Industry,* 29 NJ Super 26 (101 A2d 573) (this is the foremost authority on which claimants rely), no one of these claimants presented himself for work, or otherwise attempted to dissociate himself from the mentioned labor dispute, following publication of the liquidation order.  Through the union each continued participation in the quickened if not feverish negotiations leading to "signing up" the following Sunday.  Not until after the strike was settled did any one of them claim that he had been discharged by the fact of publication—and partial execution—of the liquidation order.  Like Lazarus, all desired "to be fed with the crumbs which fell from the [bargaining] table." (Luke, 16:21.)  Nearly all, when applying for unemployment compensation, checked "labor dispute" on the form of application as the assigned reason for unemployment.  So, and as the contemplative reader of said section 29 will fairly discern, the real and consequent question is whether these claimants have established, as a matter of law:

(a) That this labor dispute came to an end on August 12th rather than August 21st, and

(b) That the "stoppage of work" caused by such labor dispute came to an end August 12th (or on some date prior to resumption of mining and manufacturing on September 10th), or

(c) That their status, as being "directly involved" in such dispute, ceased August 12th.

*First:* Commencing with the strike call on May 2d, and continuing without interruption until August 12th, the disqualification of claimants under section 29 was due to a "work stoppage" occasioned by a "labor dispute in the establishment"* in which all

---

* For reflective consideration of "the establishment" as employed in said section 29, see *Park* v. *Employment Security Commission,* 355 Mich 103.

then were employed. This their counsel concede. The union—with direct involvement of claimants per said section 29 (1) (b)—struck Calumet for a declared and resolute purpose, that of obtaining "a new contract" incorporating substantially their demands as made. It is abundantly clear that the union—and the claimants—"meant business," that is, the union intended by the strike and its week-upon-week and month-upon-month continuity to force a desired result by attritional process. Calumet, as it turned out, was just as grimly determined to overpower rather than yield. Mighty forces met in pitched battle, each being ready and able to deal out hurtful and tragic blows without regard for consequential injury to employer, employee, community, or the welfare of this isolated area. From the standpoint of intent neither contender was bluffing. The showdown came when the final blow was struck. Facing more or less permanent unemployment, added to the dire threat of immediate cessation of utility and other "company services," the union manifestly was compelled to take what it could—in a hurry. So were the appellant claimants. Such considerations, appealing though they may be, provide no ground on which we of right may overturn a decision made by the appointed administrator of the employment security act. The reason is that no error of law appears in rendition of the administrator's conclusion upon the facts shown in evidence.

If this issue—of changed status as of August 12th—had been tried by authority of law to a court and jury, would we not uphold a jury finding that the claimants remained disqualified, as "directly involved" in a continuing labor dispute, until that dispute was settled?* Would we not, at the same time,

---

* See Dean Stason, quoted in *Knight-Morley Corp.* v. *Employment Security Commission,* 350 Mich 397, 420; also, the unemployment compensation cases of *Producers Produce Co.* v. *Industrial Commission,*

note the continued participation of claimants, as members of the union, in such continued negotiations; also their omission of any act or declaration of dissociation from such dispute? Finally, would we not hold that the triers of fact were entitled to infer from the evidentiary proof that the employer was persuaded, by appeal of claimants themselves (through the union) plus that of others, to abandon its determination to liquidate? Did not the claimants benefit by the course pursued between August 12th and August 21st? May they have that benefit—niggardly though it may be in their view—and, at the same time, claim benefits accruing on the theory that they, after August 12th, no longer were "directly involved"? I turn from these questions to controlling authority; controlling because it is the only authority in point.

In *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 US 143 (67 S Ct 245, 91 L ed 136), like questions were presented. The claimants were regularly employed by the petitioner corporations in the seasonal work of catching and canning salmon in and near Alaskan waters. It became necessary, on account of termination of the previous working contract between the companies and the union representing claimants, that a new contract for the 1940 season be negotiated. The negotiations commenced March 6, 1950, and "quickly developed into an impasse." The companies finally notified

---

365 Mo 996 (291 SW2d 166) and *Weimer Unemployment Compensation Case,* 176 Pa Super 348 (107 A2d 607). Note especially the concluding paragraph of *Weimer,* applying to an unemployment compensation case our well-known rule of "favorable view." We quote (p 355):

"The duty of this court is performed by an examination of the testimony in the light most favorable to the party in whose favor the board has found, giving that party the benefit of every inference which can be logically and reasonably drawn from it. *Elnit Unemployment Compensation Case,* 168 Pa Super 158, 160 (77 A2d 668)."

the union that if operations were to be carried on during the imminent fishing and canning season, agreement would have to be reached by April 10th as to the annual Karluk operation and April 12th as to the annual Chignik operation. . Although negotiations proceeded up to such dead-lines, the parties were able to arrive at no point of agreement. Accordingly, on April 22d, the companies "formally announced" (they as here meant what they said) abandonment of 1940 Karluk and Chignik operations. Negotiations continued, however, and a contract was finally executed on May 29th; too late for the 1940 operations.

It is significant that the continuation of negotiations between the companies and union, from and after the dead-line and abandonment dates, was held as having provided fair support of an administrative finding that claimants' unemployment was with disqualificationary result due to the dispute. Pointed also is the upheld view of the administrative agency (Alaska unemployment compensation commission) that a "labor dispute" continues as "active" during the "continuance of a work stoppage induced by" such dispute.

*Aragon* is a leading case, handed down by leading authority.* It cannot be distinguished either in principle or fact from the case before us. And its text suggests fair need for uniformity of interpretation of these essentially standard provisions of the unemployment compensation laws of the several States, each being "part of the legislative scheme for unemployment compensation induced by the provisions of the social security act of 1935" (see foot-

---

* One of my Brothers, critical of *Aragon,* suggests that its value as precedent was watered down in *Brannan* v. *Stark,* 342 US 451 (72 S Ct 433, 96 L ed 497). I find nothing in *Brannan* tending to support such thought. The only reference to *Aragon,* or any rule of *Aragon,* is in the dissenting opinion. There the postulates of *Aragon* on which I rely are extolled (p 484).

note 2, p 145 of *Aragon's* report) and each being supported by Federal grants on certificate of the secretary of labor that the given State "has an unemployment compensation law approved * * * under the Federal unemployment tax act" (42 USCA, § 502).

We tried recently to achieve such parity of interpretation by getting Michigan into line with dominant State authority construing other weighted words of said section 29 (*Park* v. *Employment Security Commission, supra*). By decision here, I suggest that we continue in similar stride by following the supreme court's guide in *Aragon*.. So, and on strength of *Aragon* and other citations to follow, I would hold that the Michigan employment security commission is by the act vested with broad and flexible authority to determine when a disqualifying stoppage of work—"existing because of a labor dispute in the establishment" of employment—has come to an end, and that its appeal board did not in this case roam beyond the legal boundaries of such authority.

The following connected passage from *Aragon* (pp 153, 154) is adopted for the purpose of present decision:

"Respondents urge that, assuming their unemployment was due to a labor dispute, there was no labor dispute in 'active progress,' within the meaning of the act, after the passage of the dead-line dates.. It is argued that when the expeditions were abandoned by the companies, the dispute must necessarily have terminated since there was no possible way in which negotiations could have brought about a settlement. It should be observed, however, that the record does not reveal that negotiations abruptly terminated with the passing of the last dead-line date. Conferences continued at Seattle in which both the companies and the union were represented. The

respondents considered the negotiations sufficiently alive to make an offer of terms at least as late as May 29th. Even if it be assumed that at some time within the 8-week period of disqualification the point was reached when all possibility of settlement disappeared, it does not follow that the commission's finding of a dispute in 'active progress' must be overturned. Here, as in *National Labor Relations Board* v. *Hearst Publications, Inc.* (1944), 322 US 111, 131 (64 S Ct 851, 88 L ed 1170), the question presented 'is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially.' To sustain the commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings. The 'reviewing court's function is limited.' All that is needed to support the commission's interpretation is that it has 'warrant in the record' and a 'reasonable basis in law.' *National Labor Relations Board* v. *Hearst Publications, Inc., supra; Rochester Telephone Corp.* v. *United States* (1939), 307 US 125 (59 S Ct 754, 83 L ed 1147).

"Applying these tests, we are unable to say that the commission's construction was irrational or without support in the record. The commission apparently views a dispute as 'active' during the continuance of a work stoppage induced by a labor dispute. That agency might reasonably conclude that the unemployment resulting from such work stoppage is not of the "involuntary" nature which the statute was designed to alleviate, as indicated by the statement of public policy incorporated in the act by the territorial legislature. We see nothing in such a view to require our substituting a different construction from that made by the commission entrusted with the responsibility of administering the statute."

Similar instances, where the courts have upheld administrative determinations of disqualification under this standard statutory provision, are found as follows:

*Buchholz* v. *Cummins*, 6 Ill2d 382 (128 NE2d 900). In this case, during progress of a "labor dispute," the employing association (of restaurant operators) closed all restaurants in which the plaintiffs, some 225 in number, were employed. The plaintiffs contended that there was a want of evidence sufficient to show that their unemployment was due to a "labor dispute." The court said (pp 389, 390):

"While the bargaining continued there was a strike at 1 of the member restaurants involved in the negotiations. In retaliation, the association locked the doors of all their establishments. Bargaining under the aegis of the lockout, the association came to an agreement with the union, the lockout ceased, and the employees returned to work. Plaintiffs earnestly contend that this is all coincidence; that there is no substantial evidence to show that the lockout was caused by their labor dispute with their employers. We cannot agree. True, there is no evidence of the actual subjective intent or reasoning of the association in calling the lockout, but we cannot believe that such evidence is required. We find a full-fledged labor dispute existing between the association and the union, and we find a lockout during the progress of that dispute. The fact that the lockout was triggered by certain vague events at the Palace [Cafeteria] does not alter the situation. If these plaintiffs had walked out because of the dispute at the Palace, could it be said that the strike was not caused by a labor dispute? And, if the plaintiffs, through the union, had called a strike because of the expiration of the contract between the union and the association, could it be said that the strike was not caused by a labor dispute? The facts of industrial relations reveal that any one of a num-

ber of unrelated events may act as the catalyst to foment a strike or lockout, but the end result is that of one group exerting economic pressure upon another. In such case our legislature has determined that benefits will not be paid under the unemployment compensation act."

*State, ex rel. Employment Security Commission,* v. *Jarrell,* 231 NC 381 (57 SE2d 403). In this case, during the course of a "labor dispute," the employer posted the following notice:

"Notice to all employees. Pee Dee Mill No. 2 will cease all operations effective as of this date for an indefinite period. All employees are free to seek employment elsewhere."

The court held (pp 385, 386):

"By posting the notice, the company merely accepted the shut down of the mill as an accomplished fact, and signified its willingness to terminate its employment relationship with any worker who elected to withdraw from the existing labor dispute and to seek work elsewhere. The notice did not alter the status of any employee who refrained from exercising this option. It certainly did not cause the unemployment of those who were already on strike and who continued on strike until the existing labor dispute ended."

*Schoenwiesner* v. *Board of Review, Division of Employment Security,* 44 NJ Super 377 (130 A2d 648). In this case the "company jumped the gun" by a quick lockout after the union had taken a strike vote and was engaged in the process of putting the strike vote into effect. The court held that a "labor dispute," within purpose of the statute, includes a "lockout," citing among numerous authorities *Unemployment Compensation Commission of Alaska* v. *Aragon, supra.*

*Gentile* v. *Director of Division of Employment Security,* 329 Mass 500 (109 NE2d 140). In this case (during pendency of a strike) the employer sent a letter to all employees stating "in effect that if they did not return to work as of a given date they would be replaced." It was found that "The employees did not treat the letter as terminating the relationship but 'continued to negotiate through their union in an effort to end the strike;'" also that the employees did not indicate in any way "to the employer or the union that there was any intention on their part to terminate their employment relationship with Reed and Prince." A finding of the administrative agency below that claimants were disqualified for benefits on account of their continued involvement in the unabated labor dispute was upheld.

*Adkins* v. *Indiana Employment Security Division,* 117 Ind App 132 (70 NE2d 31). In this case, with a "dispute" pending, the employer closed up shop and refused entrance to the claimants when they appeared for work. Negotiations followed and a new working agreement was ultimately executed by the employer and the union (of which claimants were members). The claimants insisted that their unemployment was due to a lockout, rather than a "labor dispute," and that the disqualificationary provisions of the statute did not apply. The court held (p 142):

"As we view the evidence in this case, it is immaterial whether appellants' unemployment was caused by a 'strike' or a 'lockout' for the reason that in either event it is crystal clear that such unemployment was the direct and immediate result of the 'controversy concerning terms and conditions of employment,' which arose on November 9, 1945, between the employer and employees in the employer's machine shop, and, therefore, such unemployment was the result of a 'labor dispute' within the meaning and

purview of section 7(f)(3) of the Indiana employment security act."*

Finally, attention is directed to *Legacy* v. *Clarostat Manufacturing Co.,* 99 NH 483, 486 (115 A2d 424), where the following passages appear:

"The plaintiff's unemployment began because of a stoppage of work due to a labor dispute and would not have continued 'but for' this stoppage. Even authorities taking generally a favorable view of claimants' rights concede in these circumstances that the stoppage is causal of the unemployment. 17 U of Chi L Rev 294, 313, 315; see, also, 8 Vand L Rev 338. The cases cited by the plaintiff where the courts have held an intervening cause existed are all distinguishable from the situation here as in *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 US 143 (67 S Ct 245, 91 L ed 136), where the employer decided to halt all operations without reference to the labor dispute.   *   *   *

"While the plaintiff concedes the work stoppage may have continued after the termination of the dispute, he contends that as to him it ended when there was work enough for 1 shipping clerk to do. This assumes that the work stoppage is to be determined from the standpoint of the individual employee rather than the operation of the plant as a whole. This is not so as has been previously stated. It is admitted that the work stoppage as to the plaintiff was caused originally by a labor dispute. Because of this dispute the stoppage continued to exist even as to this plaintiff's individual job until management in the exercise of reasonable judgment rehired him. The weight of authority and we believe the better view reaches this result in similar cases holding that a stoppage of work does not cease until normal operations may reasonably be resumed by the employer. *In re Stevenson,* 237 NC 528 (75 SE2d

---

* The Indiana act was revised in 1947. For reference to unemployment compensation legislation in various States, see note to Burns, Indiana Stat Ann § 52–1525.—REPORTER.

520), and cases cited; *Lawrence Baking Co.* v. *Un-employment Compensation Commission,* 308 Mich 198 (154 ALR 660). Such operations had not been resumed before the plaintiff's re-employment on January 17, 1953."

*Second:* This appeal stimulates reaffirmance of that which firmly establishes the limited scope of judicial review of administrative decisions. Unless (as in *Park* v. *Employment Security Commission, supra*) the reviewing court is able to point out, and then define, some controlling rule of law which, in its application to the findings of the given administrative agency, quite unfounds the conclusion such agency has reached, it is the duty of the court to affirm that the agency has exercised its judgment within the area of discretion entrusted to it by legislative authority. This is the sense to which a majority of this Court is committed (*Knight-Morley Corp.* v. *Employment Security Comm.,* 350 Mich 397, 411; *McCarthy Chevrolet Co.* v. *Revenue Dept.,* 351 Mich 558) and it marks the peripheral limit of our function on present review. The bellwether authority is *Rochester Telephone Corp.* v. *United States,* 307 US 125 (59 S Ct 754, 83 L ed 1147) (see reliance on *Rochester* in *Aragon* and approving quotation of *Rochester* in *McCarthy Chevrolet Co.* v. *Revenue Dept., supra,* 566). In that case the court repeated (p 146) what it said in *Mississippi Valley Barge Line Co.* v. *United States,* 292 US 282, 286, 287 (54 S Ct 692, 78 L ed 1260), that is:

"The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body."

Here we are asked to set aside an administrative determination that these claimants are, under the provisions of said section 29, "disqualified for benefits" as claimed by them. To do so we must seize

upon one of many related and ultimate facts—that of publication of the "liquidation order" and commencement (just commencement) by the employer of the grim and purposeful process of boarding up and going out of business—as conclusive proof that the "intervening cause"* alleged by claimants was established as a matter of law. This we cannot do. In paraphrase of *Aragon, supra,* it should be held that the appeal board had a right to conclude that the continued unemployment of claimants resulting from the aforesaid "stoppage of work" was not of the "involuntary" nature which our statute was designed to alleviate, as indicated by the declaration of policy constituting section 2 of the unemployment security act (CL 1948, § 421.2 [Stat Ann 1950 Rev § 17.502]). This but follows the rule of the Federal courts generally on review of administrative decisions under the Taft-Hartley act,† that is to say, "the board's interpretation of the act and the board's application of it in doubtful situations are entitled to weight" (*National Labor Relations Board* v. *Denver Building & Construction Trades Council,* 341 US 675, 692 [71 S Ct 943, 95 L ed 1284]).

*To conclude:* This is not a great case. It sets no precedent of new or portentous proportions. No exciting or commotional alarums—real or figmental—will arise from our determination that the appeal board did not misinterpret or reversibly misapply said section 29. Yet this is what lawyers call a hard case; hard in the sense that what was done

---

* The first (and pivotal) stated question appearing in the brief of plaintiffs-appellants reads as follows:

"Did the announcement of liquidation on August 12, 1955, and the steps taken to give effect to same, by the defendant-employer constitute an intervening cause so as to terminate the employer-employee relationship between plaintiff-claimants and defendant-employer and thereby remove the disqualification of plaintiffs-appellants for unemployment benefits by virtue of section 29, subd (1) (b) of the Michigan employment security act?"

† The case cited discusses 29 USCA, § 158(b)(4)(a).—REPORTER.

to bludgeon submission of the strikers is likely (as in the antithetic case where strikers are shown as having brought an employer to his knees by brutal and ruthless means) to bend or misshape normal judgment.  When, in addition to the coolly purposeful threat of indefinitely continued unemployment throughout the affected area, entire communities face the callous shutting off of main-supplied "company" water and other corporately furnished utility services, there is no fair contest of the right to strike against the right of lockout.  And the fact brought here, that some apparently favored employees were promptly certified (by Calumet) for unemployment benefits as hundreds of others were successfully resisted (by Calumet) in their subsequent effort to obtain such benefits, softens the case not one whit. Thus our meditation since submission of the case has called for constant self-reminder that we sit not as chancellors but as reviewers of claimed legal error on the part of an administrative agency.  We cannot do equity, should equity be due (a question not decided of course), as in an equity case.  We cannot even express concurrence with the appeal board's conclusion as an original question.  Our function is exhausted once it is found, as we have found, that the evidentiary record permitted the appeal board to draw such conclusion.  Contemplating the record otherwise might lead, however inadvertently, to the writing of bad law in a law case. "It is easier for heaven and earth to pass, than one tittle of the law to fail" (Luke 16:17).

By the noted dissent which at the time so dismayed his erst friend and recent appointer,* Mr. Justice Holmes put these thoughts in the following

---

* See chapter 33 of Catherine Drinker Bowen's "Yankee From Olympus" ("The Northern Securities Case — Theodore Roosevelt Frowns"), pp 366–370 (Little, Brown & Co., 1944).

words (*Northern Securities Co.* v. *United States,* 193 US 197, 400, 401 [24 S Ct 436, 48 L ed 679]):

"Great cases, like hard cases, make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well-settled principles of law will bend. What we have to do in this case is to find the meaning of some not very difficult words. We must try, I have tried, to do it with the same freedom of natural and spontaneous interpretation that one would be sure of if the same question arose upon an indictment for a similar act which excited no public attention, and was of importance only to a prisoner before the court. Furthermore while at times judges need for their work the training of economists or statesmen, and must act in view of their foresight of consequences, yet when their task is to interpret and apply the words of a statute, their function is merely academic to begin with,—to read English intelligently,—and a consideration of consequences comes into play, if at all, only when the meaning of the words used is open to reasonable doubt."

Reading (intelligently it is hoped) the English of said section 29 as authorizing an administrative ruling that the disqualificationary status of claimants continued over the period of time for which benefits are claimed, I find no error and therefore would affirm, without costs, the circuit court order dismissing certiorari.

EDWARDS, J., concurred with BLACK, J.

CARR, J. (*concurring*). The order of the circuit court of Ingham county affirming on certiorari the

decision of the defendant appeal board should be affirmed.    That a labor dispute, beginning May 2, 1955, and continuing for a number of weeks thereafter, existed between Calumet & Hecla, Inc., and its employees, including the plaintiffs in this proceeding, is not open to question.    The matter at issue is when the unemployment resulting from such dispute ended.

On the 12th of August, 1955, the employees through their union having rejected an offer made by the employer, the company issued a so-called liquidation notice stating, in substance, that it was closing its mines and plants, and liquidating the properties involved in the existing strike.    However, negotiations were continued and on August 21, 1955, a new agreement was executed.    Thereupon preparations were carried out for the resumption of operations.    It appears that by September 10th following such operations reached a stage of normalcy.

On behalf of plaintiffs it was contended before the appeal board that the strike ended August 12th, at the time of the issuance of the notice of intended liquidation.    Obviously, however, negotiations were continued thereafter, and resulted in an agreement being reached pursuant to which operations, and employment, were continued.    The appeal board, after consideration of the testimony taken on the hearings before the referee, concluded that during the period beginning May 2, 1955, and ending September 10, 1955, plaintiffs were unemployed because of a labor dispute and were, in consequence, disqualified from receiving benefits during such period under provisions of section 29 of the employment security act,* CLS 1956, § 421.29 (Stat Ann 1957 Cum Supp § 17.531).

---

* CL 1948, § 421.1 et seq., as amended (Stat Ann 1950 Rev § 17.501 et seq., as amended).

On appeal in the nature of certiorari the decision of the appeal board was upheld, the circuit judge saying, in part:

"This court has reviewed the lengthy record in this cause and cannot find that the decision of the appeal board is contrary to the great weight of the evidence or contrary to law. There is no question that for the period between May 2 and August 13, 1955, the claimants were disqualified for benefits because of a labor dispute. On and after August 13, 1955, the labor dispute continued and the dispute ended on August 21, 1955. That nature of the company's operations are such that they could not put everyone back to work immediately when the dispute ended, but rather it took several weeks to get the mines and various operations back in production. The record discloses that all employees were called back to work after the strike ended as quickly as possible, but some time had to elapse before all normal operations could be started again. The notice of August 12, 1955, that the company was liquidating their business did not change the status that a strike was in progress. The labor dispute did not end until August 21, 1955, and all employees were called back to work as quickly as possible after that date."

We are in accord with the conclusions of the circuit judge. The proofs taken in the proceeding clearly supported the factual findings of the appeal board. The application of the statutory provisions relating to disqualification to receive benefits, above cited, required the conclusion reached.

An analogous question was involved in *Buzza* v. *Unemployment Compensation Commission,* 330 Mich 223. It was there held that plaintiff employees were not entitled to receive unemployment benefits during the period following the ending of the strike and the completion of preparations by the employer to resume normal operations. It may be noted, also,

that under section 38 of the employment security act, CLS 1956, § 421.38 (Stat Ann 1957 Cum Supp § 17.540), the Court may not reverse the decision of the appeal board of the employment security commission on a finding of fact unless the decision "is contrary to the great weight of the evidence." As before indicated, the findings of the board were clearly supported by the evidence taken in the proceeding.

The order of the circuit court of Ingham county is affirmed. Defendant employer is entitled to costs on the appeal to this Court.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

SMITH, J. (*dissenting*). To the facts stated in companion opinions I can add but little. Our disagreements lie in the legal effect of those facts.

This case presents 2 principal issues: First, the effect in law of an order of liquidation, executed and implemented; second, the effect of such order and implementation upon the unemployment-compensation status of the plaintiffs, who had been out on strike, as compared with other employees, who had not.

The crux of the latter issue is simply the equality, under the law, of workmen with respect to unemployment compensation. The company sought to establish 2 categories of employees, as to one of which benefits were payable upon the company's liquidation, but as to the other of which benefits were to be denied. Those entitled, under the company's theory, were those people who "had continued to work during the strike," the clerical, supervisory, and salaried employees. Counsel continues, "They were not members of the bargaining unit, with the exception of about 16 that are shown on an exhibit who were engaged in maintenance. Those people the

company had deemed its employees throughout the strike from May 2d right up to August 12th, when the layoff started, and I think the company was very proper in certifying them for benefits under the act."*

But there was another group of employees. These had been out on strike. The company contended that it was an "illegal" strike, that they had voluntarily left their work, that they were guilty of misconduct, that they themselves had thus "automatically" terminated the employer-employee relationship, and, hence, that they were not entitled to unemployment compensation. (At no time, the company is careful to point out, had it attempted to discharge these employees.) With respect to such employees, however, the appeal board correctly ruled that "the alleged 'illegality' of the work stoppage arising out of a labor dispute may not be the basis for considering the participation of the claimants in the strike which began on May 2, 1955, as a termination of the employer-employee relation existing between the claimants and the employer herein for the purposes of the Michigan employment security act."

Despite this ruling that the strikers remained employees, the appeal board holds that they are not entitled, upon the liquidation of the company, to unemployment compensation. Yet the record shows that some 51 other employees have been approved

---

* "*Q*. Now, exhibit P you recollect what it is, Mr. Sincock?

"*A*. Yes, sir.

"*Q*. Those who are employees who the company felt that because they were working during the period of the strike so to speak, they were entitled to benefits at the time the liquidation notice went into effect, is that right?

"*A*. They were entitled to benefits at the time.

"*Q*. And the company also took the position that supervisory personnel in addition to maintenance personnel were entitled to unemployment benefits when the liquidation notice went into effect, is that right?

"*A*. To the best of my knowledge."

therefor by the commission.* The company interposed no objection to such payment. In fact it affirmatively stated to the commisison that (as to such employees) "we have no objection" to the payment of unemployment compensation. The latter group should, nothing countervailing appearing, have it. The plant was in liquidation. All employer-employee relationships were terminated. But why deny it to the former strikers?

This case is a blood brother to *Cassar* v. *Employment Security Commission,* 343 Mich 380, and much of what we said there, dissenting, is equally applicable here. In each case unemployment compensation is denied as a punishment. In each case the result is reached through the application to labor of an asserted rule of law not applied elsewhere in the law. In *Cassar* it was that a work stoppage, alleged to be in breach of contract, should be construed, not as coming under the labor dispute clause of the unemployment compensation act, but as "misconduct." Yet if this doctrine, that a breach of contract is misconduct, were applied generally in our law it would make misfeasants, and wrongfully so, of substantial numbers of our business population. In the case before us the asserted rule, not applied elsewhere as we shall see, is that an admitted, accomplished act (*i.e.,* liquidation) shall not have its normal legal results if the board chooses to construe it as a maneuvering device, a mere strategem.

As to the misconduct aspect of the company's argument, there is no need that I restate my views thereon. They are fully set forth in my dissenting opin-

* The manager of the Calumet branch office of the Michigan employment security commission made affidavit as follows: "I further certify that the action taken by the Michigan employment security commission shows whether the claims were approved for payment, subject to a waiting week, or whether payments were effected or denied." Here follow 51 names in the column headed "Approved (ww or pd)." The meaning of "ww" is waiting week and "pd" is paid.

ion in *Cassar, supra.* The issue of the asserted illegality of the strike, however, and the effect of such asserted illegality upon the right to unemployment compensation, requires similar examination. The company asserts that the strike was illegal, pointing out that timely notice was not sent to the Federal mediation and conciliation service and the State mediation agency, as required by the Federal act.* The asserted justification for such failure we need not explore, since even if we assume that notice was not given, and, moreover, that it was unjustifiably withheld, the penalty therefor is stated in the Taft-Hartley act itself, namely, that the strikers shall lose their remedies under sections 8, 9 and 10 of such act.† I find it nowhere stated, either specifically or by fair intendment, that, in addition, those failing to take the procedural step listed shall forfeit their benefits under the applicable unemployment compensation act. It would be entirely possible, of course, for our people, acting through their legislative representatives, to provide that labor's unjustified failure (or, indeed, any failure) to make a prescribed notification in the course of a labor-management controversy would deprive all strikers of later benefits should the plant be liquidated as an outgrowth of the controversy. This would, in truth, be a potent weapon, since its force would be exerted primarily upon the wives and children of the strikers. It has not yet been employed.

We hold again, as was held, dissenting, in *Cassar, supra,* that the unemployment compensation act is not to be used as a means of punishment or of penal-

---

* Section 8(d)(3), labor management relations act, 29 USCA, § 158 (d)(3).

† "Any employee who engages in a strike within the 60-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purpose of sections 158–160 of this title [sections 8–10 of the act], but such loss of status for such employee shall terminate if and when he is re-employed by such employer." 29 USCA, § 158(d)(4).

ty for alleged violations of either contractual or statutory provisions.

As to the liquidation issue, if the plant, in truth, went into liquidation it was no longer an operating concern suffering a strike but a defunct company which had had a strike. That the liquidation decision might at some later date, a year hence, a month, or even a week, be revoked makes it nonetheless under liquidation in the interim. It cannot, as to the act before us, be construed as liquidated for certain corporate purposes and employees but nonliquidated for other purposes and other employees.

We will look, then, at the liquidation: The notice we need not repeat. It is set forth in full in my Brother BLACK's opinion. It was clear and unequivocal. But the company did not stop with notice alone. There was immediate implementation thereof. All pumping in the mines was stopped. The removal of equipment from the mines was commenced. There is no need to further detail precise action taken because the defendant company itself admits that liquidation order "became effective immediately." It was, defendant company states, seriously made, in good faith, and it was implemented.

Why, then, is not the employer-employee relationship terminated? Because, holds the appeal board, "these actions must be considered as bargaining tactics."

The board has been betrayed into error. In the first place, I find not one scintilla of evidence that the liquidation was merely a bargaining tactic. The company insists that it was done in good faith and effective at once. The claimants agree. From whence comes, then, this "bargaining" business? Is it a question of fact? I find no such fact. Is it a question of law? Not one case has been cited to us supporting such a holding and our independent research has disclosed none. Thus the holding does

.violence both to the facts and to the law. But it does violence elsewhere, as well. However it be phrased, whether expressed as the principle of "mutuality" in contracts, as "equality is equity" for the chancellor, or in the simple speech of the bulk of our people that it is a poor rule that does not work both ways, the underlying principle thus variously expressed is a part of our heritage at the common law. Let us accept, then, for the moment, the board's ruling that a liquidation is not a liquidation if it is a bargaining tactic. The same reasoning would suggest the conclusion that a strike is not a strike if it is a bargaining tactic. So, just as the plant was never liquidated, the strike never occurred. Did the whole thing ever happen? What would our Brethren now hold if the appeal board had said that these claimants had never been on strike at all because their work stoppage was merely a bargaining tactic?

But even if we assume, with the board, that the company's motive in so closing was for bargaining purposes only, and did not represent a final, good-faith going out of business, the assumption is irrelevant to the legal effect of what was done. The motive for the action taken is not important, nor is it an issue, nor does it control determination. The board has confused an unequivocal, admitted act with the motive therefor. Bargaining tactics are a commonplace in our economic society. Property is bought and sold daily for bargaining purposes. One's purchase of a lot for the purpose of bargaining with the adjacent owner would not relieve the purchaser of liability to the neighbor for trespass nor to the State for taxes. The reasons for a company's making a purchase, opening a plant, selling its products, and, in due course, for its merger, consolidation, or liquidation do not control the legal effectiveness of the various actions taken. It has never, to our

knowledge, elsewhere been held that title does not pass because a purchase is made for bargaining purposes, or that a plant's opening or closing was likewise ineffective for such reason. The law could, indeed, be so written. No transaction, no act, would have what we now regard as its normal legal effect if entered into for bargaining purposes. The difficulties thus invited we need not explore. Suffice to say our law is otherwise. It is precisely the fact that our law is otherwise that renders an act undertaken for bargaining purposes really effective as a bargaining instrument.

The proposition is one of widespread application. The motive causing the exercise of the will to do the act, the secret intent with which it may be done, are, in ordinary business transactions, not involving fraud or crime, immaterial and foreign to the common law. Labor law does not lack cases involving its application to the strike situation. Thus in *Deshler Broom Factory* v. *Kinney,* 140 Neb 889 (2 NW2d 332), it was argued by workmen seeking unemployment compensation that their concerted quitting of work and leaving the plant was not a labor dispute for other reasons we need not here elaborate. The court simply held (p 893) that "disqualification under the act depends upon the fact of voluntary action and not the motives which brought it about." Such was also the finding of the California court in *Bodinson Manufacturing Co.* v. *California Employment Commission,* 17 Cal2d 321, 328 (109 P2d 935): "In brief," held the court, "disqualification \* \* \* depends upon the fact of voluntary action, and not the motives which led to it." These holdings are merely expressive of the common law. The appeal board is as powerless to disregard this fundamental legal principle as it would be to disregard the doctrine of consideration.

But, it is argued, the case of *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 US 143 (67 S Ct 245, 91 L ed 136), is authority for our affirming of the action taken by the appeal board, and, in turn, by the circuit court. The difficulty with this case as authority for any principle of administrative law is that it applies 2 different and inconsistent "rules" within the same decision to the same legal proposition. On the question whether the labor dispute was in "active progress" it refuses to substitute its judgment for that of the commission. My Brother BLACK quotes the language employed (p 153) relating to "warrant in the record" and "reasonable basis in the law." But as to the question of the situs of the dispute (on which the circuit court of appeals had reversed the commission) the court exercised its own judgment in these words (p 156): "We conclude that under the circumstances of this case the dispute was 'at the factory, establishment, or other premises' in the sense intended by the territorial legislature." This, it will be noted, is the court's own determination of situs, not a reliance (as in the former question) upon the reasonableness of the commission's determination. See Davis, Administrative Law, ch 20. Yet the facts as to each question (as distinguished from the legal effects of such facts) were not in dispute.

We do not, however, regard the long-debated issue of a court's preclusion of judicial review of an agency ruling upon a matter of statutory interpretation, if it be reasonable, and have warrant in the record, as settled by the page 153 holding of *Aragon,* or, indeed, any single decision before or since its date. Much has been written of the rational basis doctrine and *Aragon* does nothing to clarify the problem. Without tracing the doctrine, from the earlier holdings, and to make one selection from a long list, the case of *National Labor Relations Board*

v. *Hearst Publications, Inc.,* 322 US 111 (64 S Ct 851, 88 L ed 1170) gives it strong, but not conclusive, support.   Yet the court's exercise of its own judgment, as involved in its holding on page 156, finds equally strong support in a similarly impressive list *per contra,* from which we may cite the case of *Social Security Board* v. *Nierotko,* 327 US 358 (66 S Ct 637, 90 L ed 718, 162 ALR 1445).   The comments upon *Aragon* found in *Brannon* v. *Stark,* 342 US 451, 484 (72 S Ct 433, 96 L ed 497), also tend to illumine its value as precedent in its own court of origin.   The fact of the matter is that there is no simple rule of thumb as to the reviewability of administrative determinations of statutory interpretation.   The question arises in too many guises, ranging from specific orders to matters of general regulation, from (quasi) legislative rules to (quasi) judicial decisions, from interpretations of the agency's jurisdiction to interpretations as to its choice of weapons once having assumed jurisdiction. Much of the current confusion in this area arises from our effort to make one suit of clothes fit all mankind.

Viewed, however, as a matter of judicial principle we must express the most profound misgivings as to the judicial course of action expressed on page 153 of *Aragon, supra,* if applied to the issue before us. Here it is no more than an abdication of our judicial function to approve an administrative tribunal's decision merely if it involves a "reasonable" construction of a statute.   Many constructions of a statute may be reasonable.   We must do our best, with all possible aids, to find the correct one.   Thus we cannot say that the narrow interpretation of our majority of the word "accident" in *Wieda* v. *American Box Board Company,* 343 Mich 182, involved an unreasonable construction of the statute, but it was clearly incorrect in that it did not reflect the intendment of

the legislature in the act before us. The basic interpretation of a statute is a judicial act, confided in us by the Constitution. This duty, power, and privilege, cannot be usurped by others nor can it be abandoned by us. It was Mr. Justice Brandeis who phrased the doctrine with his usual felicity in the *St. Joseph Stock Yards Case:*\* "The supremacy of law demands that there shall be opportunity to have some court decide whether an erroneous rule of law was applied." In short, the administrative decision as to the interpretation of a statute may aid us but it cannot silence us.

It should be added on this topic, that even if we were foreclosed from judicial review, provided only that the board's statutory interpretation found warrant in the record and a reasonable basis in the law, such foreclosure could not prevent our correction of the error of law committed by this board. Here we can find neither warrant in the record nor a reasonable legal basis for a conclusion (that the liquidation was merely a bargaining liquidation) denied by both litigants, supported by no fact, and immaterial as a matter of law.

We must express, also, the most serious doubts as to the extent to which jury analogies should control our holdings with respect to the administrative process. At the extremes, such as, at one extreme, questions of simple fact,† or at the other (as here) clear questions of "law," the jury analogies may be helpful. But with analogy the jury parallel exhausts its usefulness. Judicial interpretation of statutes delimiting the scope of review of the rulings of the administrative bodies is still in embryonic state and must not be currently frozen in any mold, partic-

---

\* *St. Joseph Stock Yards Co.* v. *United States,* 298 US 38, 84 (56 S Ct 720, 80 L ed 1033).

† *Knight-Morley Corp.* v. *Employment Security Commission,* 350 Mich 397.

ularly that of the jury. The jury and the administrative tribunal have different origins and serve different functions. Their areas of overlap are relatively narrow and should not be allowed to obscure their essential differences.

We are not disposed to dissect the remainder of the cases relied upon as authority for a contrary conclusion. They present, to our mind, varying shades of intensity as to the issue of causation for unemployment. The reasoning of some we would accept. The reasoning of others we would reject. Their fact situations are widely disparate. Thus, in *Aragon, supra,* supplies had been purchased and vessels prepared for a forthcoming operation which had to be abandoned because of the labor dispute. Likewise, in nonseafaring disputes, an employer may purchase supplies and materials of an intended job, only to have the whole project cancelled because of a labor dispute. These are not liquidation cases. The difference between suspension of a given operation and the effective liquidation of a plant is, conceivably, merely a question of degree, but equally so is the difference between temporary unconsciousness and death.

A final caveat. We would not be understood as holding that if an act, or a public announcement, is ambiguous we will not resort to all of the surrounding circumstances to determine its meaning. The point of this opinion has a different thrust: Here an employer admits doing an act and admits that it was immediately effective. Under these circumstances it is a manifest error of law for an administrative tribunal to deny such act its legal effect upon the *ex post facto* speculation, based upon its success or failure, that the action was taken for its strategic effect. If the liquidation order had never been "revoked" (the terminology of revocability is not ours but that of the defendant company), if

the plant were closed today, would the liquidation nevertheless have been held a mere bargaining device? In such event, for how long would the labor-dispute disqualification continue? As long as the plant remained closed? Our Brethren may next have to rule that the liquidation of a plant is not effective until the workmen "accept" the closing in some way, possibly by seeking work elsewhere, or taking some other action, thus converting the closing of a plant to a bilateral act. If, moreover, acceptance be thought material to the issue we note that, in the company's words, the plaintiff claimants applied for unemployment benefits "in most cases between August 12th and August 21st," some before and some after. In most cases, also, they listed "labor dispute" as the reason for the application. Had these miners composed these applications with the learning and skill of a Tschaikovsky composing a concerto, or astute counsel a contract, more precise legal terminology might well have been employed. But a liquidation due to a labor dispute is nonetheless a liquidation, unless, of course, we must now sift and weigh the directors' decision to liquidate. Are we to deny unemployment compensation if unhappy labor relations (*i.e.,* a "labor dispute") principally controlled their decision, but grant it if other economic stress were responsible? Once more we search the act for authority and the common law for precedent, but none we find, except, possibly, the lonely and anachronistic *Cassar* decision, *supra,* in which unemployment compensation was denied as a punishment for alleged breach of contract.

It is our opinion that the intendments of the act require that from the moment the liquidation order became effective as to one employee the relationship of employer-employee was terminated as to all employees, and all, the allegedly bad as well as the presumptively good, became entitled to unemployment

compensation if, as, and when compliance was had with the remaining requirements of the act. *Great A. & P. Tea Co.* v. *New Jersey Department of Labor & Industry,* 29 NJ Super 26, 30, 31 (101 A2d 573).* There is nothing in our State law preventing a corporation from liquidating its plants when it so desires.

That right the defendant company exercised. But it cannot have it both ways: it cannot have a liquidated plant for the purpose of labor negotiations undertaken, in appellees' well-chosen words, "to avoid disaster to the community," but a nonliquidated plant for the purposes of unemployment compensation. Nor, with respect to such compensation, may it be liquidated as to one group of employees and nonliquidated as to the rest.

The judgment of the circuit court should be reversed and the cause remanded to the circuit court with instruction to remand the matter to the Michigan employment security commission for further

---

* "We agree with the board of review's findings that there was a work stoppage on March 4th because of a labor dispute, and therefore the provisions of NJSA 43:21–5(d) come into play. Although 'labor dispute' is not defined in the unemployment compensation act, it is in other labor enactments. The term broadly includes any controversy concerning terms or conditions of employment or arising out of the respective interests of employer and employee. (Citing cases.) The reasonableness or unreasonableness of employee demands, or the merits of the dispute, have no place in determining whether a labor dispute exists. *Fash* v. *Gordon* (1947), 398 Ill 210 (75 NE2d 294). Accordingly, claimants are not entitled to unemployment benefits for the week ending March 7, 1953. NJSA 43: 21–5(d).

"The employer's decision to abandon the egg-candling operation at its Paterson warehouse after March 6, 1953, brought the work stoppage to an end, for there was no work available from that time on. As already stated, it is clear that the workers had not terminated or severed their relationship with the employer; it continued until Friday, March 6th, when they were notified that the egg-candling operation was discontinued. The claimants are therefore entitled to unemployment benefits for all weeks of unemployment established after March 7, 1953, partial or total, in accordance with the unemployment compensation act—legislation whose underlying policy is the protection of employees from involuntary unemployment (citing cases) and which, being remedial in nature, should be liberally construed."

proceedings not inconsistent herewith. No costs, a public question.

VOELKER and KAVANAGH, JJ., concurred with SMITH, J.