COPPER RANGE COMPANY *v.* UNEMPLOYMENT COMPENSATION COMMISSION.

1. UNEMPLOYMENT COMPENSATION—SCOPE OF REVIEW OF QUESTIONS OF FACT AND LAW BY COURTS.

   The scope of the review of questions of fact and law, arising in the administration of the unemployment compensation act, by the circuit court of Ingham county, and on appeal therefrom by the Supreme Court, is limited by provisions of the act (Act No. 1, § 38, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 364, Pub. Acts 1941).

2. SAME—CONSTRUCTION OF STATUTES.

   Since the purpose of the unemployment compensation act is to relieve the distress of economic insecurity due to unemployment and it was enacted in the interest of public welfare to provide for assistance to the unemployed, it is entitled to a liberal interpretation (Act No. 1, Pub. Acts 1936 [Ex. Sess.], as amended).

3. SAME—LABOR CONTROVERSY.

The payment of unemployment benefits is not dependent upon the merits of a labor controversy (Act No. 1, Pub. Acts 1936 [Ex. Sess.], as amended).

4. SAME—COMMON LAW.

Common-law principles are inapplicable to the decision of proceedings for benefits under the unemployment compensation act (Act No. 1, Pub. Acts 1936 [Ex. Sess.], as amended).

5. SAME—CONSTRUCTIVE VOLUNTARY LEAVING OF EMPLOYMENT.

The doctrine of constructive voluntary leaving of employment by employees, is not applied where it appears that when reduced scale of wages was presented as the alternative to discontinuance of submarginally productive mining and smelting operations by plaintiff, a majority of the employees voting thereon declined to accept the proposition and operations were shortly thereafter suspended (Act No. 1, § 29, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 246, Pub. Acts 1943).

6. SAME—PURPOSE OF STATUTE.

The unemployment ·compensation act is designed to accomplish the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own (Act No. 1, § 2, Pub. Acts 1936 [Ex. Sess.]).

7. SAME—COURTS.

Courts are without power .to deprive those entitled thereto of the benefits of the unemployment compensation act, unless they are expressly precluded therefrom by its provisions (Act No. 1, § 2, Pub. Acts 1936 [Ex. Sess.]).

8. SAME—ABROGATION OF WORKING AGREEMENTS BY EMPLOYERS.

Employers confronted with economic loss may not demand an abrogation of their working agreements and reduce compensation to a point unacceptable to their employees ·and thereby absolve themselves of the responsibilities imposed upon them by the unemployment compensation act (Act No. 1, § 29, Pub. Acts 1936 [Ex. Sess.], as amended by Act No. 246, Pub. Acts 1943).

Appeal from Ingham; Eger (Paul G.), J. -Submitted January 15, 1948. (Docket No. 3, Calendar No. 43,818.) Decided April 5, 1948. Rehearing denied May 18, 1948.

Certiorari by Copper Range Company, a Michigan corporation, against Michigan Unemployment Compensation Commission and others to review award of unemployment compensation. Judgment for plaintiff. Defendants James W. Austin, claimant, and others appeal. Reversed and remanded for entry of judgment.

*H. C. Schulte* and *Shields, Ballard, Jennings & Bishop,* for plaintiff.

*Maurice Sugar, Ernest Goodman* and *Morton A. Eden,* for defendants and claimants.

*Eugene F. Black,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Arthur W. Brown,* Special Assistant Attorney General, for defendant Michigan Unemployment Compensation Commission.

BUSHNELL, C. J. Plaintiff Copper Range Company, a Michigan corporation, is engaged in the mining, milling and smelting of copper. Prior to September 20, 1945, it employed 596 men in its mining operations at Painesdale, Michigan, 67 in its mill at Freda, and 83 in its smelter at Coles Creek. These employees are members of the International Union of Mine, Mill and Smelter Workers, C.I.O., United Copper Workers, Local 494. Plaintiff's relations with its employees are expressed by a written working agreement dated May 10, 1945. Under this agreement, rates of pay are governed by those in effect on September 30, 1942, as modified by a directive order of the nonferrous metals commission, and approved by the economic stabilization director, and a directive order of the national war labor board,

dated March 30, 1945. The details of these are unimportant for the purposes of this opinion.

Prior to World War II, plaintiff had ceased operation for some time because of mining conditions which made production unprofitable. The increased need for copper output due to the war caused the government to encourage plaintiff and others owning submarginal mines to resume their operations. Shortly after the declaration of war a ceiling price of 12 cents per pound was placed on copper. Recognizing that some companies could not continue operations and sell at this price, exceptions were written into the ceiling price law, known as the premium price plan, which permitted some producers to be paid up to 17 cents per pound, depending upon their production cost. Certain other producers, including plaintiff, were granted still higher prices under sales agreements with governmental agencies. For some time the output of plaintiff's mine had been purchased by Metals Reserve Company, a governmental agency, at a price fluctuating between 17 and 26 cents a pound, depending upon cost of production.

This contract was terminated on July 31, 1945, the plaintiff, however, securing an extension to August 31st. Thereafter the company secured a reinstatement of the 17-cent rate and rearranged its operations, but concluded, however, that it could not continue its existing wage scale because of the lower price. Plaintiff then submitted a plan to the bargaining committee of the union for certain adjustments, and indicated its willingness to place such plan in operation for trial, reserving, however, the right to suspend operations if the plan proved unsuccessful. This proposal was rejected by the members of the union during the last week in August by a vote of 201 to 197. The bargaining committee,

under authority granted to it by the union, overrode the votes of the employees and announced to the company an acceptance on behalf of the union. It was deemed advisable to resubmit the matter to the members of the union and, consequently, a notice was posted on the bulletin board containing details of the new plan and stating that it was the very best that could be offered under present circumstances, "and that there is no room for bargaining. In the event the plan is not accepted by the employees, the company will suspend mining operations."

Another vote was taken on September 16th, and the proposal was again rejected by a vote of 245 to 236. The executive board and the bargaining committee informed the company that it had been deprived of power to conduct further negotiations. On September 18th, the company posted another notice, again explaining the situation in detail, and concluding with the following statement:

"The union by its vote refused the company's offer, and inasmuch as the company is unable to continue without either price or cost relief, it is forced to suspend operations.

"The company therefore regrets to advise that all production at the mine will cease at the end of the afternoon shift on Thursday, September 20, 1945, and that all operations at the mine, mill and smelter will cease as soon thereafter as clean-up work will permit."

In accordance with this notice all production ceased at the end of the afternoon shift on September 20th, although some employees were thereafter retained for maintenance and clean-up work.

On October 9th the employees took a third vote, after which the company was notified by the union that its proposal was accepted. However, by that date, according to the company's testimony, it was

too late to resume operations, a number of men having left the locality, machinery having been removed from the mine, and some of the cargoes of coal coming by water having been cancelled.

The employees, as they were dismissed, then filed claims for unemployment compensation under the terms of the Michigan unemployment compensation act (Act No. 1, Pub. Acts 1936 [Ex. Sess.], as amended (Comp. Laws Supp. 1940, 1945, § 8485–41 *et seq.,* Stat. Ann. 1946 Cum. Supp. § 17.501 *et seq.*).

The commission determined that claimants were entitled to such benefits because of "no work" and the company appealed from this determination to the referee.  At the hearing before the referee on November 19, 1945, it was stipulated on the record that the material facts governing the case of James W. Austin, appellant herein, are substantially identical with the facts governing the 538 other claimants, and that such cases were consolidated with the understanding that decision in the Austin case would govern all the others.  It was stipulated that the mater should be considered on the sole quesion whether the men had voluntarily left their work without cause attributable to the employer, no labor dispute, lock-out, or strike being involved.

The referee filed an opinion on December 3, 1945, finding that Austin and others were laid off for lack of work, and that section 29, subds. (a) (b) (c) of the unemployment compensation act, as amended by Act No. 246, Pub. Acts 1943 (Comp. Laws Supp. 1945, § 8485–69, Stat. Ann. 1946 Cum. Supp. § 17.531), "does not operate to impose any disqualification for benefits on any one of said claimants." He accordingly affirmed the determination of the commission.  The company then filed notice of appeal to the appeal board, which heard the matter on

February 20, 1946. The decision of the board, filed March 21, 1946, affirmed the determination of the referee, with one member dissenting therefrom. A writ of certiorari was granted by the circuit court of Ingham county on April 1, 1946, and the court filed its opinion on February 25, 1947.

The trial judge held that the vote of October 9th was irrelevant and that the record amply showed why operations could not be resumed. He added that, regardless of this, the matter should be determined by the events which occurred on or before September 20th. His conclusions are stated as follows:

"When the employees rejected the company's proposal they by their vote affirmatively said not only that they would not accept the company's proposition, but that they would not abide by the terms of the contract and accept the wages of schedule A. Under this situation, do we need to look only to the fact that the company ceased operations on September 20th? Must we shut our eyes to the cause which impelled the company to make that decision? It is true that work stopped on that date, but the initiating reason was a refusal of the members of the union not only to accept the company's offer, but to abide by the terms of schedule A which they by their representative had agreed would become effective upon the ending of the government contract. They are responsible for their unemployment, it was voluntary on their part, and the company is not to blame."

Austin and others took an appeal from a judgment entered on March 15, 1947, which reversed the determination and decision of the appeal board and that of the referee. This judgment states that:

"This determination is based upon the disqualification imposed by section 29 (a) of the Michigan

unemployment compensation law, and in view of this determination, this court does not find it necessary to decide the question as to whether the said claimants are disqualified under section 29 (b) of the Michigan unemployment compensation law."

Claimant argues on appeal that, under the circumstances of this case, he has not "left his work voluntarily," and "without good cause attributable to the employer," nor has each employee involved herein "failed without good cause  *  *  *  to accept suitable work when offered him by any employing unit or the commission."

Claimants also argue that the findings of fact by the appeal board, and particularly its finding "that the claimants did not leave work voluntarily, but that the direct and actual cause of their unemployment was the appellant's overt act in shutting down the mine to a point where there was no work for them," is not contrary to the great weight of the evidence within the meaning of section 38 of the act so as to justify the circuit court in reversing the decision of the appeal board.

Plaintiff-appellee denies the contentions of claimants and argues that "the refusal of the union to accept the reduction in wages or a proposal offered by the mining company in mitigation thereof, following the revocation of the subsidy, constitutes a voluntary leaving of work by members of the union within the meaning of section 29 (a) (1) of the Michigan unemployment compensation act, when the company by reason of such refusal is compelled to suspend operations."

The unemployment compensation commission argues on appeal that the appeal board, having found as a matter of fact and law "that the actual and direct cause of the unemployment  *  *  *  was the overt act of the appellee company in shutting down

its mines, and that the appellants did not leave work voluntarily," and therefore that the circuit court erred when, upon a statutory review of this administrative proceeding by writ of certiorari, it reversed the decision of the appeal board.

The Michigan unemployment compensation act, though comparatively new, has been carefully considered in recent cases, among which are: *Godsol* v. *Unemployment Compensation Commission,* 302 Mich. 652 (142 A. L. R. 910); *Lawrence Baking Co.* v. *Unemployment Compensation Commission,* 308 Mich. 198 (154 A. L. R. 660); *O'Brian* v. *Unemployment Compensation Commission,* 309 Mich. 18; *Auten* v. *Unemployment Compensation Commission,* 310 Mich. 453; and *Palmer* v. *Unemployment Compensation Commission,* 310 Mich. 702 (158 A. L. R. 909).

The crux of the controversy in the instant case is whether Austin and others left their work voluntarily without good cause attributable to the employer (section 29 of the act [Comp. Laws Supp. 1945, § 8485–69, Stat. Ann. 1946 Cum. Supp. § 17.531]), and we proceed on the assumption that the provisions of subsection (c) of section 29 with respect to labor disputes are inapplicable.

The scope of the review of questions of fact and law by the circuit court of Ingham county, and on appeal therefrom by this Court, is limited by the provisions of section 38 of the act, as amended by Act No. 364, Pub. Acts 1941 (Comp. Laws Supp. 1945, § 8485–78, Stat. Ann. 1947 Cum. Supp. § 17.540). This section was discussed in the *Godsol Case, supra,* in which this Court said:

"The purpose of the unemployment compensation act is to relieve the distress of economic insecurity due to unemployment. It was enacted in the interest of public welfare to provide for assistance to the

unemployed and as such is entitled to a liberal interpretation.''

In the *Lawrence Baking Case, supra,* 208, it was said:

''The payment of unemployment benefits is not dependent upon the merits of a labor controversy.''

. Again, in the *O'Brian Case, supra,* the Court pointed out that common-law principles are inapplicable in the light of the provisions of the act which should be liberally construed to accomplish its purpose.

In the *Auten Case, supra,* it was noted the question there was one of first impression, and the provisions of the law should be liberally construed.

Plaintiff-appellee in support of its argument that claimants left the employment of the company, cites ample authority on situations involving failure or refusal to return to work after temporary layoffs or discontinuance, though requested by the employer to continue; failure to report for work during the course of labor disputes; or discharge at the request of the union in accordance with the terms of its contract with the employer. None of these conditions exists in the present controversy, and we are not as yet prepared to accept and apply the doctrine of constructive voluntary leaving, particularly in the light of the circumstances of the instant case.

As stated in the opinion of the superior court of Pennsylvania in the case of *MacFarland* v. *Unemployment Compensation Board of Review,* 158 Pa. Sup. 418 (45 Atl. 2d 423), as reported in Vol. 6, C. C. H. U. I. S. p. 41511, par. 8131:

''When we say, 'he left work voluntarily,' we commonly mean, 'he left of his own motion; he was not discharged.' ''

According to the facts in the instant case, Austin and others continued in their employment until operations were suspended, as stated in the company's posted notice, "at the end of the afternoon shift on Thursday, September 20, 1945."

We are mindful of the economic facts which confronted the company, such as submarginal productivity, termination of the government contract, and the unsuccessful attempts to co-operate with claimants. We are also mindful that the company's operations had been profitable for a considerable period, and that economic gain is often followed by economic loss.

It is probably sufficient to note that the declared policy of the act is to lighten the burden of economic insecurity due to involuntary unemployment, and that the act, according to its terms, is designed to accomplish:

"The systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment by the setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, thus maintaining purchasing power and limiting the serious social consequences of relief assistance, is for the public good, and the general welfare of the people of this State." (Act No. 1, § 2, Pub. Acts 1936 [Ex. Sess.] [Comp. Laws Supp. 1940, § 8485-42, Stat. Ann. 1947 Cum. Supp. § 17.502]).

In the face of this legislative declaration of policy, courts are without power to deprive those entitled thereto of the benefits of the act, unless they are expressly precluded therefrom by its provisions.

To place the stamp of judicial approval upon the contentions of appellee in the instant case would be tantamount to the issuance of a notice to all employers in Michigan that, whenever they are confronted

with economic loss, they can demand an abrogation of their working agreements and reduce compensation to a point unacceptable to employees, and thereby absolve themselves of the responsibilities imposed upon them by the unemployment compensation act.

We are also mindful of the implications of our decision in the instant case and its possible application to conditions yet unforeseen. However, careful review of the record presented requires agreement on our part with the conclusion reached by the appeal board that:

"In addition to the referee's findings and observations, it is clear to us that the appellant made an offer to the workers through their union, which was their legally designated bargaining agent for all the employees, with a statement that if the offer was not accepted the company would shut down all operations. When the union failed to comply, the appellant in conformity with its previously announced intention, shut down all operations, notwithstanding the fact that the workers continued with their work until the mine was actually shut down by the appellant. Under these circumstances, it is obvious that the claimants did not leave work voluntarily but that the direct and actual cause of their unemployment was the appellant's overt act in shutting down the mine to a point where there was no work for them.

"Since the record definitely establishes that the claimants worked until such time as there was no longer any work available, we do not see how it can possibly be found that they voluntarily left work. The appellant, by its own precipitate action in shutting down the mine terminated the employer-employee relationship and thus deprived the claimants of an opportunity to continue in employment. We therefore find that the referee's decision, find-

ing that the separation of the claimants was involuntary and not under disqualifying circumstances, is supported by the great weight of the evidence and should not be disturbed.''

Plaintiff-appellee argues with respect to section 29 (b):

''A second though related basis for disqualifying the claimants may be predicated entirely upon section 29 (b) of the unemployment compensation act since the claimants by refusing the offer of continued employment may be considered to have refused without good cause a suitable offer of work with the resultant disqualification provided for in section 29 (b).''

The same reasoning applies to this argument with respect to section 29 (b) as that applied to section 29 (a).

The judgment of the circuit court is reversed and the case is remanded with direction to enter a judgment in accordance with this opinion. Costs of both courts to appellants.

SHARPE, BOYLES, REID, NORTH, BUTZEL, and CARR, JJ., concurred. DETHMERS, J., did not sit.