WICKEY v. EMPLOYMENT SECURITY COMMISSION.

1. UNEMPLOYMENT COMPENSATION—JUDICIAL REVIEW OF DETERMINA-TIONS.

The court, on review of the determination of the appeal board of the employment security commission, must first determine whether the matter for review involves solely a question of law, solely a question of fact, or a compound question of law and fact (CLS 1956, § 421.38).

2. SAME—JUDICIAL REVIEW OF DETERMINATIONS—QUESTIONS OF LAW.

The judicial review of determinations of the appeal board of the employment security commission on questions of law is not limited by the employment security act (CLS 1956, § 421.38).

3. SAME—JUDICIAL REVIEW OF DETERMINATIONS—CONSTRUCTION OF STATUTES.

Interpretation of the employment security act by the appeal board of the employment security commission, if reasonable and if it has warrant in the record, may, but need not, be sustained upon judicial review even if the court would have reached a contrary result had the question arisen in the first instance in judicial proceedings (CLS 1956, § 421.38).

4. SAME—JUDICIAL REVIEW OF DETERMINATIONS—QUESTIONS OF FACT.

The employment security act requires judicial affirmance of the determinations of the appeal board of the employment security commission if its findings of fact are supported by the great weight of the evidence, in the absence of fraud, and reversal if such findings are contrary to the great weight (CLS 1956, § 421.38).

5. SAME—SEAMAN—DISQUALIFICATION FOR BENEFITS—VOLUNTARILY LEAVING WORK—EVIDENCE.

Finding of appeal board of employment security commission as to facts relative to seaman who failed to return to his ship at a New York port, did not meet it at next Ohio or Michigan ports held, as a matter of law, not to have justified his disqualification from unemployment compensation benefits for voluntarily leaving his work without good cause attributable to

REFERENCES FOR POINTS IN HEADNOTES

[1–4] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds § 49.

[5, 6, 8–10] 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds §§ 34–38.

[7] 20 Am Jur, Evidence §§ 30, 44.

his employer under record showing his belated return to the dock at the New York port and period of waiting at Ohio port before returning home in western Michigan (CLS 1956, § 421.29).

6. SAME—SEAMAN—DISQUALIFICATION FOR BENEFITS—MISCONDUCT CONNECTED WITH WORK—EVIDENCE.

Finding of referee of employment security commission that claimant seaman was guilty of misconduct in connection with his work disqualifying him for unemployment compensation benefits *held*, well within the range of testimony of witnesses whom only the referee saw and heard, where his responsibility was that of fire patrolman on a passenger ship from 10 at night to 6 in the morning and he had failed to make timely return to his ship because of prolonged social activities while on shore leave (CLS 1956, § 421.29).

7. EVIDENCE—JUDICIAL NOTICE—COAST GUARD REGULATIONS.

The Supreme Court takes judicial notice that duly-promulgated coast guard regulations have the force of Federal statutes.

8. UNEMPLOYMENT COMPENSATION—DISQUALIFICATION FOR BENEFITS—MISCONDUCT CONNECTED WITH WORK.

Determination of whether or not an employee has committed an act of misconduct in connection with his work that disqualifies him from receiving unemployment compensation benefits requires a consideration of all of the facts and particularly the degree of responsibility the claimant owes to the employer and what his infraction of the rules means as far as hardship or trouble to the employer (CLS 1956, § 421.29).

9. SAME—SEAMAN—MISSING SHIP—DISQUALIFICATION FOR BENEFITS.

Missing ship or failure to report for watch, recognized by union contract and necessities of maritime discipline as grounds for summary dismissal of a seaman, *held*, also to constitute misconduct connected with the work which disqualified the seaman from the right to unemployment compensation benefits (CLS 1956, § 421.29).

10. SAME—DISQUALIFICATION FOR BENEFITS—CONSTRUCTIVE VOLUNTARY LEAVING OF WORK.

The employment security act does not embrace a disqualification for unemployment compensation benefits because of a constructive voluntary leaving of work, hence, determination of appeal board of the employment security commission that in effect constituted an adherence to such doctrine was in error (CLS 1956, § 421.29).

SOURIS and OTIS M. SMITH, JJ., dissenting in part.

Appeal from Muskegon; Fox (Noel P.), J. Submitted January 8, 1963. (Calendar No. 1, Docket No. 49,695.) Decided March 7, 1963.

Robert Wickey presented his claim for unemployment compensation following discharge from steamship South American, for missing ship after shore leave. Compensation denied by referee for misconduct, and by appeal board for reason that claimant voluntarily left employment. On certiorari by claimant against the Michigan Employment Security Commission and its appeal board and against employer, Chicago, Duluth & Georgian Bay Transit Company, an Indiana corporation, order set aside and claimant was determined not disqualified for unemployment benefits for either reason. Defendant employer appeals. Reversed and remanded for order denying unemployment compensation benefits because of discharge for misconduct.

*John J. Namenye,* for plaintiff.

*Lucking, Van Auken & Miller (Donald J. Miller,* of counsel), for defendant employer.

SOURIS, J. (*dissenting*). The proper scope of judicial review of the decisions of administrative tribunals has been a subject of much dispute on this Court in recent years. This dispute involves our interpretation of statutory limitations upon judicial review of agency decisions and limitations developed at the common law upon our review of such decisions by certiorari. Unfortunately, on this subject we have spoken with 2 and sometimes with 3 tongues, each with considerably less precision than the bench and bar of this State are entitled to expect from us. Our principal fault lies, if fault is to be be assessed, as was said by Mr. Justice TALBOT SMITH about 1 aspect of this controversy, "from our effort to make

1 suit of clothes fit all mankind." *Peaden v. Employment Security Commission,* 355 Mich 613, at p 643.

Section 38 of the Michigan employment security act, CLS 1956, § 421.38 (Stat Ann 1960 Rev § 17.540), provides that:

"The findings of fact made by the appeal board acting within its powers if supported by the great weight of the evidence, shall, in the absence of fraud, be conclusive, but the circuit court * * * shall have power to review questions of fact and law on the record made before the referee and the appeal board involved in any such final decision, but said court may reverse such decision of said appeal board upon a question of fact only if it finds that said decision of the appeal board is contrary to the great weight of the evidence."

Nothing in the foregoing statutory language limits the judiciary's power to review administrative determinations of issues of law as distinguished from issues of fact. However, with reference *only* to "findings of fact made by the appeal board," we are required by the statute to consider such findings conclusive unless they are "contrary to the great weight of the evidence." Therein lies part of our difficulty, for only rarely have we made the sometimes difficult effort to distinguish between issues of fact, issues of law, and compound issues of fact and law. Too frequently we have applied to all such issues the statutory limitation upon our review of factual determinations set forth above from section 38 of the act.

But that is only a part of our difficulty. Another part of our difficulty arises from a perceptible inclination to extend that statutory limitation to preclude judicial review of fact or of law determinations if the administrative decision is supported in the record by "some evidence." See, for example, Mr.

Justice BLACK's concurring opinion in *Lyons* v. *Employment Security Commission*, 363 Mich 201, at 230. Thus, not only is the statutory "great weight of the evidence" limitation applied now to review of questions of law as well as to review of questions of fact, but that limitation soon may be supplanted judicially by the more restrictive "some evidence" limitation. We have traveled such great distances down the path of abnegation of judicial duty in this area of the law that traditional judicial safeguards against administrative error may be beyond the point of no return.

Contributing to the confusion resulting (1) from our failure to make the sometime difficult distinctions between fact and law in applying the statutory limitation upon our review of agency determinations of fact and (2) from the inclination to devise judicially a more restrictive "some evidence" rule, is (3) an occasional reference, again without distinction between issues of fact and issues of law, to the permissive doctrine of statutory construction that an agency's *interpretation* of a statute, if reasonable and if it has warrant in the record, *may* be sustained upon judicial review even if we would have reached a contrary result had the question arisen in the first instance in judicial proceedings.* Here, again, confusion has been compounded, not only by misapplication of this doctrine to administrative findings of fact as well as to administrative interpretations of statute, but also by application of the doctrine as an immutable rule of law. See *Peaden* v. *Employment Security Commission, supra.*

---

* Generally cited in support of this doctrine is *Unemployment Compensation Commission of Alaska* v. *Aragon,* 329 US 143 (67 S Ct 245, 91 L ed 136). But even in *Aragon,* this doctrine was not applied in the court's review of the agency's finding of *fact:* Was claimants' unemployment "due" to a labor dispute at the establishment at which last employed. 329 US at 151-153. See, also Mr. Justice TALBOT SMITH's critical analysis of *Aragon* in his opinion in *Peaden, supra,* p 642.

The entire range of this controversy and its consequences are illumined in the opinions found in *Knight-Morley Corporation* v. *Employment Security Commission,* 350 Mich 397 (Justice Talbot Smith's opinion, beginning at p 411) ; *Peaden* v. *Employment Security Commission, supra* (Justice Black's opinion, beginning at p 614, and Justice Talbot Smith's opinion, beginning at p 635) ; and *Miller* v. *F. W. Woolworth Co.,* 359 Mich 342 (Justice Talbot Smith's opinion, beginning at p 358). From all that has been written it should be clear that not every appeal from the employment security commission's appeal board, or from any administrative agency for that matter, can be affirmed summarily by the indiscriminate application of a single simple or compound rule of judicial review to a multitude of complex agency decisions of fact or law or of fact and law.

On those rare occasions when appellate dispute rages solely upon an administrative finding of simple fact, as was involved in *Knight-Morley, supra,* our hand is stayed from reversal unless the administrative tribunal's finding of fact is contrary to the great weight of the evidence. In those cases like *Peaden, supra,* where the dispute rages over the administrative tribunal's interpretation or application of a statute, our function is not restricted by the "great weight" test in determining whether or not the agency's application of the statute to the facts found conforms with the law, and in the performance of this function we can, *but we need not,* affirm the tribunal's statutory interpretation if it is reasonable and if it finds warrant in the record. Each such case requires our preliminary determination of the nature of the dispute over the appeal board's decision. This task in itself may sometimes be difficult, as it has been in the past, but the proper performance of our judicial function demands that

it be undertaken because only when this is done can we determine the principles in accordance with which our appellate function properly may be performed.

This brings us to the case at bar, a case in which this Court's imprecision is duplicated in the briefs and arguments on appeal. It is said that the appeal board's decision was supported by the great weight of the evidence and, therefore, should have been, but was not, affirmed by the circuit judge on review by certiorari. No effort is made by the appellant to draw the fine line of distinction between the appeal board's findings of fact and its rulings of law. Consequently, on the principal issue in the case, did plaintiff voluntarily quit his employment, the whole argument of the appellant is devoted to a discussion of the great weight of the evidence, although the plaintiff does not dispute the board's findings of material fact, and without apparent concern that the board's application of its findings of fact to the law may have been erroneous as a matter of law. Yet, the real thrust of the appellant's argument in this case is that the appeal board's unchallenged findings of fact do support its conclusion of law that the plaintiff claimant voluntarily left his work without good cause attributable to his employer within the meaning of section 29 (1) (a) (1) of the employment security act. CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531). The circuit court on review by certiorari* reversed the decision of the appeal board. As we view our appellate function, and that of the circuit court, we must determine first whether or not the appeal board's conclusion of law, accepting for this purpose all of the findings of fact of the appeal board, was a legally valid conclusion. Only if we conclude that it was, need we determine whether or not the appeal board's findings of fact were sup-

---

* CLS 1956, § 421.38 (Stat Ann 1960 Rev § 17.540).

ported by the great weight of the evidence. It is our conclusion that accepting all of the findings of fact made by the appeal board, such findings of fact did not justify the appeal board's conclusion of law that plaintiff claimant voluntarily left his employment without good cause attributable to his employer. In short, we conclude that as a matter of law claimant's conduct did not constitute a "voluntary quit."

Plaintiff was a seaman aboard the S. S. South American, serving as a night patrolman when the ship docked at the Eisenhower lock at the port of Messina in New York State on June 4, 1959. At about 2 in the afternoon, being off duty, plaintiff went ashore. The first mate testified the ship's 8 p. m. scheduled departure time was posted on the bulletin board in the ship's lobby. Plaintiff denied there was any such notice posted and testified that the ship's gangway watch told him she was departing at 9. (Plaintiff's knowledge of the ship's departure time was the only material fact in dispute at the hearing before the referee, and for our purposes we shall accept the first mate's testimony to the effect that plaintiff either knew or should have known that the ship was scheduled to depart at 8 p. m.) Because of a hard wind and the late arrival of 2 passengers, the ship did not clear the dock until 9:15. Plaintiff testified he returned to the dock from town at about 9:15, but the ship already had left. The only reason he offered for missing his ship was that he had gone to a motion picture theater "and just couldn't make it back in time." On the following day, plaintiff traveled by bus to Cleveland, the ship's next scheduled United States port of call. He was advised by someone he contacted at the dock in Cleveland that the time of the ship's arrival was uncertain because she had been delayed in the Welland canal. After waiting for 2 days in Cleveland, he wired his wife in Muskegon for money and upon its receipt

he returned home. When he telephoned appellant's office in Detroit 2 days later, he was advised he had been discharged. Such were the material facts found by the appeal board and on which it based its decision.

The appellant claims that plaintiff's failure to return to the ship in time for her departure; his failure to contact the ship by ship-to-shore radio telephone; his failure to board her in Cleveland, where she docked on the day, or the day after, he left Cleveland for Muskegon; and his failure to make any effort to board her in Detroit, her next scheduled stop, establish his intention not to return to his duties aboard ship,—in other words, that he voluntarily left his work without good cause attributable to his employer within the meaning of section 29 (1) (a) (1) of the act.

We are not prepared to say that the facts as found by the appeal board establish as a matter of law that the plaintiff voluntarily quit his employment. Nothing in such evidence bears directly upon the plaintiff's intention to return to the ship or not to do so. The undisputed testimony is that he returned to the dock from Messina, a distance of 7 or 8 miles, but too late to board ship before her departure and that he thereafter made another effort, futile and unwise as it may have been, to rejoin the ship in Cleveland. These actions on his part do not support even an inference of intentional, deliberate, voluntary desertion of his ship. In *Thomas* v. *Employment Security Commission,* 356 Mich 665, followed in *Sullivan* v. *Employment Security Commission,* 358 Mich 338, this Court declined to hold that a claimant had voluntarily left his work and was, thus, disqualified by section 29 (1) (a) (1) from receiving unemployment compensation benefits, when he was arrested and jailed, for driving an automobile without having an operator's license, while en route to

his job. Thomas' failure to report for work resulted from his own voluntary act, we noted, but we also noted, at p 669, that:

"The voluntary assumption of a risk which an employee knows may, but he trusts and assumes will not, keep him from work is not the voluntary leaving of his work. Doing an act, even though voluntarily, which results, contrary to the doer's hopes, wishes and intent, in his being kept forcibly from his work is not the same as voluntarily leaving his work. The statute mentions the latter, but not the former, as an act disqualifying for benefits. 'We are not as yet prepared to accept and apply the doctrine of constructive voluntary leaving.' *Copper Range Company* v. *Unemployment Compensation Commission*, 320 Mich 460, 469. It is not the proper function of the court to amend the statute to broaden or extend the disqualifications fixed, in plain language, by the legislature. Whether one in claimant's situation ought to be disqualified is a question of policy for the legislature, not a judicial question to be determined by the court."

The point is that this plaintiff, like Thomas, so far as this record discloses, intended, and attempted, to return to his work aboard ship. Although his delay in leaving Messina, which caused him to miss his ship, may have been "voluntary," just as Thomas' driving without an automobile operator's license was "voluntary," such voluntary action is not the same as voluntarily leaving one's work. We would add to the anomalies of the law if we were to hold in this case that an employee who returned to his place of employment too late to work had, in effect, voluntarily quit, but not so an employee prevented by legal arrest from returning to his work.

Plaintiff's subsequent action in proceeding to Cleveland, where the ship was next scheduled to dock, likewise demonstrates not an intention to quit his job but, rather, an intention to resume it. That

other or additional efforts may have been more effective in accomplishment of his purpose cannot be denied, but his failure to do what it is said he should have done falls far short of establishing as a matter of law that plaintiff thereby voluntarily quit his job.

Mr. Justice Dethmers, in *Thomas, supra,* commented upon the doctrine of constructive voluntary leaving and concluded, as did the Court in 1948 in the *Copper Range Company Case, supra,* that such a doctrine has no place in our law of unemployment compensation. More recently, Justice Talbot Smith, speaking for some of us, in *Jenkins* v. *Employment Security Commission,* 364 Mich 379, at pp 384 and 385, put the matter in these terms:

"But the hazard guarded against, as we have heretofore held, is an actual voluntary leaving, not a constructive one. Of course, as a matter of legal theory, we can always 'construct' a voluntary quit out of something else, just as we can construct an 'eviction' while a tenant is still in the premises. But such theory, that of the 'constructive' voluntary leaving we rejected, unanimously, many years ago. It was then argued to us that when the employees rejected a reduced wage scale, as an alternative to a shutdown, and cessation of work followed, their action, in legal effect, constituted 'a voluntary leaving of work by members of the union.' Our Court rejected this 'as if' argument, stating bluntly that 'we are not as yet prepared to accept and apply the doctrine of constructive voluntary leaving.' [Citing *Copper Range Company, supra.*] We are still unprepared to accept and apply such doctrine, neither found in the act we are called upon to interpret nor germane to its purposes."

Having concluded that the facts as found by the appeal board did not, as a matter of law, justify plaintiff's disqualification from unemployment compensation benefits for voluntarily leaving his work

without good cause attributable to his employer within the meaning of section 29 (1) (a) (1), it becomes unnecessary for us to determine whether or not such findings of fact were supported by the great weight of the evidence.

Appellant has an alternative theory which it argued to this Court; it is that plaintiff's actions constitute disqualifying misconduct within the meaning of section 29 (1) (a) (2) of the act. CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531). That was the conclusion reached by the referee, but neither the appeal board nor the circuit judge agreed, nor do we. Since *Cassar* v. *Employment Security Commission,* 343 Mich 380, we have followed the definition of "misconduct" formulated by the Wisconsin supreme court in *Boynton Cab Company* v. *Neubeck,* 237 Wis 249, 259, 260 (296 NW 636), and which appears in 48 Am Jur, Social Security, Unemployment Insurance, and Retirement Funds, § 38, pp 541, 542:

" 'Misconduct within the meaning of an unemployment compensation act excluding from its benefits an employee discharged for misconduct must be an act of wanton or wilful disregard of the employer's interest, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has the right to expect of his employee, or negligence in such degree or recurrence as to manifest culpability, wrongful intent, or evil design, or show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to the employer.' "

At best, what we have here is a seaman missing his ship (as far as the record shows, for the first time) after unsuccessfully attempting to return to her before her departure.

It may be noted that the record discloses, and appellant's counsel repeated in oral argument to this

Court, that appellant would have permitted plaintiff to resume his duties aboard ship had he boarded her at the Eisenhower lock, even though late; or had he learned of her unscheduled stop at Erie, Pennsylvania, and boarded her there; or had he waited long enough in Cleveland to board her there, upon her arrival; or even had he managed somehow to board the ship when she reached Detroit. Under such circumstances, it strains credulity to say that plaintiff's failure to return to his ship before she departed, a failure the employer was then and later perfectly willing to overlook, nonetheless constituted misconduct for purposes of disqualifying him from receiving unemployment compensation benefits under our act. There was no evidence of conduct manifesting culpability, wrongful intent, evil design, or an intentional and substantial disregard of the employer's interest or of the employee's duties. We do not, of course, pass judgment upon the right of the employer to discharge this seaman; what we hold is that, as a matter of law, the seaman's actions as found by the appeal board did not constitute disqualifying misconduct within the meaning of the act and that the appeal board did not err in refusing to so find.

The judgment of the circuit court should be affirmed. Costs to appellee.

OTIS M. SMITH, J., concurred with SOURIS, J.

O'HARA, J. We echo the *nostra culpa* of Mr. Justice SOURIS that the bench and bar of our State are entitled to the clarification of the nature and extent of administrative review he has set out in the initial phase of his opinion.

It is at the point at which he determines that the appeal board's conclusion of law was not legally valid that our paths diverge. We agree that claimant's conduct did not, as a matter of law, constitute a "voluntary quit." Our distinguished colleague cor-

rects this error of commission. What, in our opinion, he fails to do is to extend his well-reasoned opinion to correct the equally obvious error of omission. We conclude that the finding by the referee, who was the only adjudicator in the echelon of review who actually saw and heard the witnesses, that the claimant was guilty of misconduct in connection with his work and hence disqualified under section 29 (1) (a) (2) of the Michigan employment security act* was well within the range of the testimony.

We are not unmindful that Mr. Justice Souris has addressed himself to this issue and disposed of it partially on the ground that the employer would have condoned claimant's conduct if his efforts to rejoin his ship had been successful; and partially upon the ground that misconduct under the accepted test in this State was not proved.

To the first, we answer that whatever the employer might have done about the misconduct afterward is not to the purpose in the determination of misconduct *per se*. To the second, we reply that applying the same test set out in *Boynton Cab Company* v. *Neubeck*, 237 Wis 249 (296 NW 636), which test has been adopted in this State, to the factual record we arrive at the same conclusion reached by the referee.

Needfully, we set out facts in addition to those contained in Mr. Justice Souris' opinion.

The S. S. South American is a passenger cruise ship plying the Great Lakes. She is subject to coast guard regulations, and we take judicial notice that such regulations duly promulgated have the force of Federal statutes. There is no suggestion here to the contrary.

Claimant was a fire patrolman whose duty, as described by the first mate, was to patrol the ship on the lookout for that dread peril of all who sail—

---

* CLS 1956, § 421.29 (Stat Ann 1960 Rev § 17.531).

fire at sea. From 10 at night to 6 in the morning the fire watch is required to punch the clock every 20 minutes.

When the South American docked at the upper wall of the Eisenhower lock on the St. Lawrence river at 7:05 a.m., shore liberty went automatically for crew members not on watch. Claimant was entitled to leave. According to his testimony he left the ship at 2 p.m. At this point a conflict in the testimony occurs.

The first mate contends that the bulletin posted in the lobby by the purser announced the ship's departure time as 8 p.m. that night.

Claimant disputes this testimony and creates a question of fact. He alleges that he looked at the bulletin board and there was nothing on it. He asserts he took the precaution of determining her departure time by asking the gangway watch:

"*Q.* Now isn't it customary for you, as a crew member, before you left the ship, to find out when you are supposed to be back?

"*A.* Yes, I even asked the gangway watch, and he said 'I believe she's going at 9 o'clock.' "

The union contract in effect at the time covering the obligations upon the seamen for reporting aboard and reporting for watch requires that all seamen report aboard 1/2 hour before the *scheduled* sailing time.

Disregarding the mate's testimony completely and accepting claimant's version, it was his duty to report aboard his ship at 8:30 p.m., 1/2 hour before what he understood to be her departure time. His own testimony concedes this:

"*Q.* Under the rules and regulations you were supposed to be back to the ship by 8:30, is that right?

"*A.* Well, according to our contract.

"*Q.* Yes, what time were you back?

"*A.* Well, it was about 9:15 because I understood they were going at about 9 and it is 7 or 8 miles to town and from the dock, and I just couldn't make it back in time.

"*Q.* Why not?

"*A.* I had been to a movie and just got out of the movie and by the time I reached the ship it was gone."

There was further testimony that claimant engaged in other social activities while ashore, and that he expressed some intention to another crew member of not returning to the ship. Such testimony was controverted by the claimant, and some question as to its admissibility was raised by the circuit court on review. It is not necessary for the purpose of this decision to rule upon this issue and that testimony will not be considered.

It is apparent from the record that the finding of fact that claimant wilfully missed his ship and his watch under the version of the facts most favorable to him is completely sustainable. Accepting the mate's version he was due on board at 7:30 p.m.; accepting claimant's version, he should have been aboard at 8:30 p.m. He was 45 minutes late, or an hour and 45 minutes late, in either case. His explanation—he was at a movie and just couldn't make it.

The referee pinpointed the issue in this case in his prefatory remarks on the record made before him:

"There are times of course and different types of jobs that carry with them considerable more responsibility than others, for instance night work or fireman in a plant has exceeding more responsibility than does the ordinary worker in the plant. What might be a violation or misconduct as far as a watchman is concerned might not be for another employee."

We need not expatiate on the difference between a cruise ship, passenger laden—or indeed any ship

at all—with a fixed complement, heading out into the inland seas of the Great Lakes and a shore installation. In case of fire, no passing policeman on his beat, or any casual passerby, can be expected to detect the peril. Nor once detected, can the alarm be turned in to bring fire-fighting equipment to the scene. Missing ship or failure to report for watch were recognized under the union contract, as the necessities of maritime discipline had recognized them for years, as grounds for summary dismissal. The referee who heard the testimony, viewed the witnesses, and could best assess their credibility, made findings of fact and applied correctly the applicable section of the act thereto:

"In determining whether or not an individual has committed an act of misconduct for which he is discharged we must take into consideration all of the facts and particularly the degree of responsibility the claimant owes to the employer and what his infraction of the rules means as far as hardship or trouble to the employer.

"In the instant matter the employer had the right to depend upon the claimant's returning to the ship in accordance with the provisions of the union contract or 1/2 hour prior to sailing time."

His decision, following the application of section 29 (1) (a) (2) to the facts, was:

"It is held that the claimant was discharged by Chicago, Duluth & Georgian Bay Transit Company for reasons constituting misconduct in connection with the work and is disqualified for benefits under section 29 (1) (a) (2) of the act from June 7, 1959, through the duration of his unemployment."

This issue is before us under any version of our scope of review because the circuit judge, in his opinion, passed squarely on the issue of misconduct:

"As a question of law, I find the claimant's conduct in missing the ship is sufficient to support a dis-

charge, under the terms of the company and union labor-management contract, but it is insufficient to support a denial of unemployment compensation benefits under section 29 (1) (a) (1), or section 29 (1) (a) (2) [misconduct]."

The appeal board's decision bottomed on section 29 (1) (a) (1) was legally erroneous in the application of the wrong provision of the section to the facts.

"This appeal board is of the opinion that while the employer may have considered the claimant a discharge [as discharged?], the record clearly established facts and circumstances from which it can be reasonably and fairly assumed that the claimant left his work voluntarily."

The effect of this holding was to apply the doctrine of constructive voluntary leaving. This rationale was considered and rejected in *Thomas* v. *Employment Security Commission*, 356 Mich 665, and again in *Jenkins* v. *Employment Security Commission*, 364 Mich 379 (see, also, *Copper Range Company* v. *Unemployment Compensation Commission*, 320 Mich 460).

The order of the referee denying compensation was amply supported by the evidence and was correct. The appeal board sustained the denial but on a basis other than that found by the referee. The question before the circuit court on appeal was whether the *order* denying compensation was based upon findings of fact which were against the great weight of the evidence. On the basis of the proofs in the case, compensation was properly denied for the reasons found by the referee. On appeal that order should have been affirmed. The judgment entered by the circuit court is reversed and the case remanded for entry of a judgment in accordance herewith.

CARR, C. J., and DETHMERS, KELLY, BLACK, and KAVANAGH, JJ., concurred with O'HARA, J.